[No. 23003.   Department Two.   September 10, 1931.]

ELSIE PRATHER, *by Claude N. Prather, her Guardian ad litem, Respondent,* v. G. A. DOWNS, *Appellant.*[1]

¹Reported in 2 P. (2d) 709.

428

*Cannon, McKevitt & Fraser,* for appellant.

*Tustin & Chandler,* for respondent.

BEELER, J.—This is an appeal from a judgment entered on the verdict of a jury in an action against the appellant, a physician and surgeon, for malpractice.

On November 27, 1927, the respondent, who was then seventeen years of age, sustained a fracture of the right femur, at about the middle third, in an automobile accident. At the same time she sustained several minor injuries to the right leg. These were a cut about five inches long across the shin bone, some abrasions just above and around the lower portion of the knee, and some bruises, scratches and abrasions to the lower leg.

Following the accident, the respondent was taken to the Spokane Emergency Hospital and given first aid treatment by the physician in charge. The appellant was then called in and took charge of the case, and, with the assistance of the hospital intern, sewed up the wound on the right shin and dressed it. At that time, there was some swelling but no discoloration at the seat of the fracture, the swelling being neither abnormal nor unusual for a fracture of the femur. About

midnight the respondent was removed to the Sacred Heart Hospital.

The following morning, at about 8:30 o'clock, the appellant, accompanied by his associate, Dr. R. N. Hamblen, arrived at the private hospital and made an examination of the respondent. No attempt was made by the appellant to set the broken ends of the fractured bone by placing them in apposition or alignment, or by manipulation, traction or any extension process. The appellant's explanation for his failure to adopt or apply any of these methods was the numerous abrasions on the leg which, he claimed, made traction impractical, and the lack of circulation which, he claimed, indicated an arterial rupture which necessitated an immediate operation.

After the examination made on the morning of November 28 by the appellant and his associate, the appellant decided on an open operation at the point of the fracture, and, at about 11:00 o'clock of the same morning, this was resorted to, both surgeons participating. Both the appellant and his associate testified that, after they had made the incision, they found a severed artery, the profunda, which they ligated, and, while the wound was open, fastened the broken ends together with metal bands. Immediately after the operation, the respondent was placed in a cast which extended from just below her breast to the base of her toes on the right lower extremity, and to just above the knee on the left lower extremity. No windows were left in the cast over the operative wound or over the shin wound, or elsewhere.

Infection developed soon afterwards, but no opening was made in the cast until December 5, 1927, when a window was cut over that portion of the cast covering the operative wound, and a large quantity of pus taken therefrom. Infection continued to develop. On

January 24, 1928, the appellant opened the wound and removed the metal bands. The infection in the lower limb became virulent, numerous abscesses formed so that amputation of the lower limb became necessary in order to save the respondent's life. The right lower leg was amputated some time in May, 1928, by another surgeon, the appellant having previously been discharged from the case.

At the time the metal bands were removed, on January 24, 1928, the appellant, deeming it unnecessary, took no precaution to prevent the ends of the broken bone from slipping and overlapping. This result occurred, and one of the ends of the bone protruded through the muscles to the skin at an angle of approximately forty-five degrees. This condition necessitated another operation, which was performed some time in October, 1928, by the surgeon who had superseded the appellant.

The respondent contends that the appellant was careless and negligent in the performance of the operation and in the subsequent treatment in that, first, he unnecessarily made an open operation by an incision some ten inches in length, down to and around the broken bone and joined the broken ends together by means of metal bands, without first having made any attempt to use any of the well-recognized and approved methods of manipulation, traction or extension; second, after having placed the leg in a cast, he failed to cut an opening or window over the operative wound or elsewhere, and failed to inspect the leg sufficiently to observe the development and spread of infection, but permitted the cast to remain on until the leg swelled so as to cut off the circulation in the lower limb, which produced numerous abscesses which rendered amputation necessary in order to save her life; third, that on January 24, 1928, at the time the appel-

lant removed the metal bands, he failed to use any effort to prevent the overlapping of the broken ends of the bone.

The appellant denied all these charges of negligence, denied that he was negligent in any manner whatsoever, and in his pleadings and at the trial contended that, when he took charge of the case, the respondent's leg was covered with lacerations, cuts and bruises; that the foot was cold; that there was a lack of pulsation of the dorsalis pedis and posterior fibial arteries; that the thigh was greatly swollen and edematous; the skin from above the knee joint downward was bruised in practically its entire area, and the flesh torn and crushed; that one or more large blood vessels had been cut in the thigh at the time of the fracture and that there was an increasing hemorrhage in the thigh.

The first question to be determined is whether there was sufficient evidence warranting the jury in finding that the circulatory system was impaired prior to and at the time of the open operation. The appellant, his assistant and one nurse testified that, on the morning and forenoon of November 28, prior to and at the time of the operation, respondent's leg was badly swollen; that it was hard and tight; that the toes were cold and that the circulatory system had been impaired. The appellant maintains that the profunda artery was cut or severed, and that the open operation was necessary in order to repair it, and that the ends of the broken bone were joined with metal bands because the incision or open operation had already been performed. He further contends that the skin of the leg was so abraised that traction was impractical.

On the other hand, five witnesses testified on behalf of the respondent, one of whom was the assistant to

the city surgeon of the city of Spokane stationed at the emergency hospital, who testified that the swelling was not abnormal nor unusual. The remaining four witnesses were lay witnesses. They testified in effect that the leg was not swollen; that the toes were not cold; that the toes were normal to the touch; that there were no cuts or abrasions above the knee; that no arteries were ruptured or torn, and that the circulatory system was not interfered with and that therefore there was no occasion to resort to an open operation.

In passing, it is significant to note that the hospital record, made in the appellant's own handwriting, contains no mention of an arterial hemorrhage. The preoperative diagnosis contains merely the statement: "Spiral fracture right femur, fracture right fibula." And the progress record signed by the appellant contains the following statement:

"November 28, 1928. Open operation advised on account of comminution and abrasions on leg in such locations that traction cannot be applied."

Thus it will be seen that the reason assigned by the appellant for making an open operation, as recorded on the hospital records made in his own handwriting, was not on account of one or more severed arteries, nor on account of the swollen condition of the leg, but on "account of comminutions and abrasions on the leg."

In the present case, there was ample evidence to warrant the jury in finding the appellant guilty of negligence in resorting to an open operation for the purpose of effecting a union of the fractured bone without first exhausting such well-known and universally proven methods as manipulation, traction and extension processes. Especially is this true when we take

into consideration the admissions by the appellant's expert witnesses on cross-examination. One of them testified:

"If there was no unusual swelling, any more than there was the night before, and in the comparison of the two legs there was no noticeable difference, and there was no hardness of the leg, but that it was soft and natural, and that it had the same normal temperature as usual, in other words, was not cold or hot, but a normal temperature, it would not indicate to me that there was any disturbance of the circulatory system; it would be quite incredible if there were not, with a fracture. I would say that it would not be justified to operate when there was no disturbance of the circulation."

Another expert witness who was called by the appellant, on cross-examination in response to a hypothetical question submitted by respondent's counsel on her theory of the case, stated:

"A. I will answer that yes, and then add this in explanation, that if I, myself, in making the examination, found that there was no unusual swelling of the thigh, and outside of any unusual swelling of the thigh that there was no increased tension to the thigh, and if I found the foot of a normal warmth, with the pallor, the lack of color in the skin—without those things which are associated commonly with disturbance in the circulation, then I certainly should feel that the circulation had not been interfered with. My answer would depend upon the facts as presented to me from the different theories of each side."

Still another expert called by the appellant, on cross-examination admitted:

"If there were no—well, I will answer that yes, and add this in explanation, that if I, myself, in making the examination, found there was no unusual swelling of the thigh, that there was no increased tension to the thigh, and if I found the foot of a normal warmth, with the pallor, the lack of color in the skin—without

those things which are associated commonly with disturbance in the circulation, then I certainly should feel that the circulation had not been interfered with.''

The reasons advanced by the appellant for hastily adopting the extremely hazardous open operation was his claim that the fracture had ruptured the femoral or profunda artery, thereby impeding the circulation in the injured leg, and that, by opening the flesh for the purpose of tying up the ruptured artery, he followed the usual custom of securing a union of a fractured bone by the use of metal bands. There being a conflict in the evidence as to whether there had been any impairment or interference with the circulation in the injured leg, through the rupture of an artery, or from any other cause, this question of fact was properly submitted to the jury, who found that there had been no such impairment.

A further ground of negligence asserted by the respondent was the lack of proper care accorded to the patient after the operation. A physician and surgeon who undertakes an operation is under the duty, and is required, to exercise reasonable and ordinary skill and care in his subsequent treatment. *Huber v. Hamley,* 122 Wash. 511, 210 Pac. 769.

Considerable evidence was introduced by the respondent to the effect that, after the appellant had performed the open operation, he applied a cast to the injured leg, but failed to leave or provide a window over the operative wound or elsewhere so as to determine whether infection was taking place, and permitted the cast to become so tight that it interfered with the circulation of the blood to the lower part of the leg, foot and toes, and then, through lack of inspection, failed to observe that the circulation had been impeded or cut off, which resulted in gangrene and which neces-

sitated the second operation,—the amputation of the leg.

There was evidence from which the jury was warranted in finding that, within three or four days after the cast had been placed on the leg, the toes of the right foot became purplish or dark in color, and somewhat swollen and puffy; that the respondent had developed a fever which, in itself, was an indication that infection was taking place; that the appellant failed to open the cast or cut windows in any part of the cast until December 5, 1927, when a window or opening for the first time was cut over the operative wound, and the wound opened and approximately a cupful of pus exuded therefrom. The respondent contends that the fact that the toes became swollen and puffy, dark or purplish was indicative of impaired circulation. In this she was somewhat corroborated by the testimony of appellant's expert witnesses on cross-examination, one of whom testified:

"If the cast was put on after an open operation, and within two or three days the toes became purplish and discolored and swollen, I would say there was some impairment of the circulation in the toes."

Another expert witness testified:

"I think it would be a fair presumption that if the toes became swollen and blackened it indicates that the veinous circulation is interfered with. I think obvious damage would be done if that is true and the cast is allowed to remain for four or five days."

The fact that the second operation—the amputation of the leg—became necessary in order to save the patient's life, does not of itself establish negligence. It is, however, a circumstance which the jury had a right to take into consideration in determining whether the appellant was guilty of negligence. *Sawdey v. Spokane Falls & Northern Ry. Co.*, 30 Wash. 349, 70

Pac. 972, 94 Am. St. 880; *Peterson v. Wells,* 41 Wash. 693, 84 Pac. 608; *Howatt v. Cartwright,* 128 Wash. 343, 222 Pac. 496; *Cornwell v. Sleicher,* 119 Wash. 573, 205 Pac. 1059.

"There was another circumstance which was of weight, and the jury had a right to take into consideration, and that was that a second operation was found necessary to cure the situation resulting from the operation by the appellant. In *Sawdey v. Spokane Falls & Northern Railway Co., supra,* and *Peterson v. Wells, supra,* the necessity of this second operation was recognized as producing some evidence of negligence." *Howatt v. Cartwright, supra.*

There is no dispute in the evidence as to the second operation and the necessity therefor. Whether the infection which necessitated this second operation was due to the negligence of appellant, was a disputed question of fact which the trial court very properly submitted to the jury for determination.

The jury, by their verdict, found that, after the performance of the first operation, there was a lack of ordinary care and skill on the part of the appellant in caring for his patient, and we would not be justified, in view of the facts, to hold, as a matter of law, that there was not sufficient evidence to sustain the verdict. Indeed, it is difficult to conceive how the jury could have reached any other conclusion than that the appellant was negligent in resorting to an open operation in the first instance, and in failing to observe the symptoms of impaired circulation after the operation, and also in removing the bands and permitting the ends of the fractured bone to slip and overlap. After removing the metal bands, it was his duty to exercise ordinary care to ascertain whether the broken ends of the femur remained in apposition.

It is established that the appellant took an X-ray on January 13, 1928. On January 23, 1928, he re-

corded the following hospital report: "There is union." It is undisputed in the evidence that no X-ray was taken just before the removal of the bands, which occurred on January 24, 1928, to ascertain if there was a safe and secure union, even though eleven days had elapsed from the time of taking the X-ray on January 13. Furthermore, no X-ray was taken by the appellant after the metal bands had been removed, nor at any time subsequent thereto. The flesh was opened down to the bone at the time the bands were removed. It appears that the appellant had some difficulty in removing the bands from the bone, and that they were broken in several small pieces.

After the removal of the bands, no form of mechanical fixation was applied to prevent distortion. As a result, the ends of the bone slipped and overlapped, and united and grew together with one end protruding about five inches through the thigh near the skin, which necessitated the third operation, occurring in October, 1928. While differing somewhat in their opinions as to the proper treatment to be used in such cases, all of the expert witnesses agreed that *some* method of fixation should have been followed in order to prevent distortion. The failure to do this was evidence of negligence, and that, with the other facts and circumstances proven, furnished sufficient basis for the inference of negligence on the part of the appellant.

It should be noted that, on February 12, 1928, the cast was entirely removed, but no X-ray was taken at that time to determine whether the broken ends of the bone were in alignment, and no steps were taken by the appellant to hold them in apposition.

But the appellant urges that the question whether the open operation should have been performed was a scientific question, and if surgeons disagree on the advisability of such an operation, the

jury should not have been permitted to speculate thereon. But that rule has no application to the situation that confronts us here, for two reasons. First, the physical condition of the respondent's leg prior to the operation, as to whether or not it was swollen, was not a scientific question, but a question of fact, just as apparent and visible to a layman as to a physician. The evidence of the lay witnesses as to what they observed prior to the first operation, which occurred on November 28, 1927, and as to what they observed after the cast was put on the patient, was competent. *Cornwell v. Sleicher, supra.* Five witnesses testified as to the condition of the respondent prior to the time of performing the open operation, and as to her condition after she had been placed in the cast. It was upon the testimony of these lay witnesses in that regard that the opinion evidence offered by the respondent's expert witnesses was predicated.

■ The second reason why the rule contended for by the appellant is inapplicable to the present case is that the record fails to establish that a respectable minority of the medical profession of this state recognizes it as being a proper method of treatment to perform an open operation, within such a short period of time following an accident as occurred here. On this issue, the appellant testified:

"In this town I presume there are one or two or three or four men that open up the fractures as a rule. The majority don't. . . . I know of two men here in Spokane who commonly operate on oblique fractures of the femur without any complications."

It is worthy of note, however, that the appellant did not produce as witnesses any physicians practicing their profession in Spokane to corroborate his testimony in this regard.

In *Sweet v. Douge,* 145 Wash. 142, 259 Pac. 25, the facts were quite similar to the facts in the present case, although here there is a stronger showing of negligence on the part of the appellant. It was there held that the verdict in a malpractice action should be sustained where it appeared that an open operation was performed in order to set a fractured femur without first attempting to secure a union by the use of some generally used extension process. We there said:

"In our present inquiry, as we view this case, we are not confronted with the question of discretion on the part of an attending physician or surgeon in adopting one of two or more recognized methods of treatment, but our inquiry is as to whether or not the evidence warranted the jurors in finding, as they manifestly did find, that no extension process was used in the treatment of the injury prior to opening the flesh and inserting the 'Lane Plate.' The evidence is ample to warrant the conclusion that the opening of the flesh, the injury thereto being wholly internal, and the insertion of a 'Lane Plate' with a view of holding the ends of a broken bone in apposition and alignment, is a method of last resort; so recognized by the profession generally, because of the great danger of infection following such method of treatment. The evidence also warrants the conclusion that, in a fracture of the nature here in question, the profession universally recognizes the necessity of some extension process; that of the 'Buck's Extension' or some similar process, as the one effective method of holding the broken ends in apposition and alignment to give them opportunity for healing and growth together."

Several errors are assigned based upon the giving of certain instructions and the refusal of certain others. Most of the alleged errors raised by these assignments are sufficiently disposed of by what we have heretofore said. To review them all in detail would extend this opinion to an interminable length. We have examined with care both the instructions given and

those refused. Suffice it to say that the instructions given fairly and correctly stated the law applicable to the issues raised by the evidence, and at the same time sufficiently included matters covered by the appellant's proposed instructions.

■ Several errors are assigned upon the alleged erroneous admission of testimony. Assignment XIX relates to the admission in evidence of the respondent's exhibit 25-A, consisting of a photograph showing the condition of respondent's lower limb. Apparently, this exhibit was admitted during, or as a result of, a colloquy that occurred between the counsel and the trial court. This exhibit was finally admitted without objection and, in any event, it was competent.

Several assignments of error relate to hypothetical questions propounded to the respondent's expert witness, Dr. Robinson. We have examined the several questions submitted to the witness and his answers thereto, and what we have heretofore said disposes of the questions raised by those assignments.

We are satisfied that the appellant received a fair and impartial trial.

The judgment is affirmed.

TOLMAN, C. J., MILLARD, BEALS, and MAIN, JJ., concur.