LUNDGREN, Respondent, v. MINTY, Appellant.

(266 N. W. 145.)

(File No. 7801.   Opinion filed March 30, 1936.)

*Henry H. Clark*, of Denver, Colo., and *H. F. Fellows*, of Rapid City, for Appellant.

*T. B. Thorson, W. A. McCullen*, and *Denu & Philip*, all of Rapid City, for Respondent.

CAMPBELL, J., Plaintiff instituted this action against defendant, a duly licensed physician and surgeon, to recover damages in the sum of $20,000 for claimed malpractice. Issues were joined, and the matter came on for trial to a jury. Defendant moved for directed verdict at the close of plaintiff's case and again at the close of all the testimony, and subsequently moved for judgment n. o. v., all of which motions were denied. The jury returned a verdict, finding for plaintiff on all the issues and assessing his damages at $3,500. From judgment entered thereon and from denial of his application for new trial, defendant has appealed.

Appellant most earnestly urges in this court the point presented below by his motions for directed verdict and for judgment n. o. v., to wit, the insufficiency of the evidence to support any verdict against him.

Undisputed facts appear from the record as follows: Respondent, Lundgren, a bachelor about 69 years old, was farming for himself in Haakon county, S. D., living alone. On the evening of May 7, 1933, while feeding his horses in the stable, one of the animals, becoming unruly, pushed respondent against a manger in such fashion that both bones of his right leg were broken between the knee and ankle approximately at the juncture of the lower third of the leg with the middle third. Respondent crawled into the manger, where he remained all night. Shortly after daylight in the morning he managed to get out of the barn, tied his leg up somewhat with the aid of a piece of board, a rope, and some grain

sacks, and dragged himself out to the public highway. The rural mail carrier discovered him there about 9:30 in the morning and took him to the Community Hospital at Philip, S. D., where he was attended by a local physician, Dr. Ramsay, who applied a dressing to the leg and put it in some kind of a splint. Respondent remained at the hospital in Philip from his arrival there about noon of May 8 until the afternoon of May 15, when Dr. Ramsay took him to the Black Hills Methodist Hospital at Rapid City, S. D. He made the journey from Philip to Rapid City (some 90 miles) sitting erect in the rear seat of an automobile with his injured leg supported and extended straight out. Dr. Ramsay called appellant to the case, and appellant agreed with respondent to take charge thereof and treat and care for him. Appellant first saw respondent in the hospital during the early evening of May 15. He immediately caused X-ray pictures of the leg to be taken by the hospital technician, which disclosed that the broken bones were not in apposition and that there was a considerable accumulation of gas in the soft tissues of the leg in the region of the fracture. After the X-ray examination appellant had respondent taken into the operating room, a general anaesthetic administered, and performed what is called an "open operation" upon the leg, which consisted in making an incision down almost to the ankle, practically in the midline of the leg, exposing the area of fracture, and making a second slightly curved incision down and into the calf of the leg. When the fracture was thus compounded, a considerable amount of pus and gas escaped and the incisions were left open and drainage tubes were inserted. For the purpose of pulling the broken fragments of bone into proper position, appellant then put the leg in what is known as a "Boehler splint." For the use of this apparatus a wire pin was put through the bones of the leg just above the ankle and traction was exerted thereon by means of an extension frame and weight so that the broken ends of the bones could not override. Hot dressings were used upon the leg from the knee down, and the patient's general condition was treated for a number of days. Respondent was seen from time to time by Dr. Jernstrom, Dr. Lemley, and Dr. Earl Minty, son of appellant, all of whom are licensed physicians and surgeons associated with appellant in the conducting of what is known as the Midwest Clinic

at Rapid City. A special nurse was in attendance from the evening of May 15 until the afternoon of June 19.

On May 29, after. consultation with his associates, appellant decided to discontinue the use of the Boehler apparatus. Respondent was removed therefrom and again taken to the operating room and a general anaesthetic administered. For the purpose of extending and holding in place the broken ends of the large bone of the leg, appellant applied what is known as a "cow-bone splint," which consists of a small piece of cow bone bridging the break and fastened to each of the two broken ends of bone by drilling and threading a hole therein and employing cow-bone screws. After applying this splint directly to the bone, the leg was placed in a plaster cast extending from some distance above the knee down to the toes. A window or opening was cut in the cast to allow access to the incisions made by appellant on May 15 and to the field of drainage therefrom, and an area around the heel was also cut out. On June 3, and perhaps at several other times while this first cast was on the leg, the cast was somewhat further cut away so as to enlarge both the window over the area of incision and the opening at the heel. On the evening of June 11 there was a flow of blood from the wounds on respondent's leg. By direction of appellant, the special nurse on that evening removed one of the drainage tubes from the leg and thereafter there was a further flow of blood.

On July 15 the first cast was removed and another X-ray picture was taken, which showed a little growth of new bone above the point of fracture, but no new growth below, and, in fact, some deterioration of bone tissue. The leg was then placed in an open wire cradle, where it remained until on or about July 20, when a second plaster cast was applied which corresponded in general structure to the first one, excepting that the window over the fracture and incision area was not as large as in the first cast, because there had been meantime some healing of this area. On August 24 the second cast was removed and another X-ray picture was taken, which showed further growth of new bone above the point of fracture, but little, if any, below, and, in fact, some further deterioration of bone structure below the fracture, particularly in the large bone. On August 30 respondent dismissed appel-

lant and called in Dr. Dawley, who examined the leg on August 31, and the next day made a further and more thorough examination of its condition with respondent under a general anæsthetic. Doctor Dawley thereupon returned respondent to bed, took measures to improve his general condition by administration of tonics and proper diet and the giving of a blood transfusion, and on September 7 performed an amputation at a point midway between the hip and knee. Respondent continued thereafter in Dr. Dawley's care, and his recovery appears to have been normal and uneventful to and including his discharge from the hospital on December 11, approximately the date of the institution of this action.

■ It is conceded by all concerned that at the time Dr. Minty was discharged from the case and Dr. Dawley was employed respondent's foot was badly ulcerated and exhibited symptoms which would be anticipated from an appreciable impairment of the circulation of the blood in the foot. As to the scope and extent of those symptoms and as to the condition of the foot as a whole at that time there is a conflict in the testimony. Appellant says that, when the second cast was removed, the foot was gangrenous in a limited area, but was still alive, and, as he says, "It looked as though there was still a possibility of doing something with it * * * I considered there was still circulation in it. * * *" On the other hand, Dr. Dawley was of the opinion when he examined respondent that the destruction of the foot had proceeded so far that there was no hope of being able to work any improvement in its condition and that immediate amputation was indicated. The jurors were entitled, if they saw fit, to accept Dr. Dawley's opinion on this point in preference to appellant's, and apparently they so did.

In the last analysis, the differences between appellant and respondent in their theories as to the ultimate facts of this case come to a definite focus on the question of the cause of the impaired circulation in the foot. To undertake to set out each item of evidence which is urged by the parties as lending support to their respective views would prolong this opinion unduly and would be of no particular value to any one, but their contentions may be summarized about as follows:

Appellant maintains that he is possessed of the degree of pro-

fessional skill which the law contemplates he should have, that in caring for respondent he exercised such skill without negligence, in accordance with his best judgment, and pursuant to good professional practice, and that the ultimate injury suffered by respondent is a misfortune for which appellant is not responsible and which the exercise of all requisite care, skill, and good judgment could not avoid. He maintains that the leg was badly infected in the area of the fracture when respondent was brought to him; that his treatment throughout was in complete accord with the best standards of his profession; that the bleeding from respondent's leg on the evening of June 11 was in fact a very abundant flow directly from the posterior tibial artery, which is one of the two large arteries supplying blood to the foot. Appellant says this bleeding constituted a very profuse hemorrhage, so extensive as to be medically known as a "massive hemorrhage." He says that this hemorrhage occurred because the infection in the leg had eaten into and partially destroyed the wall of this large artery, which was a thing his care and skill could not have avoided, that, as a consequence of the destruction or partial destruction of this artery, the circulation of blood to the foot was immediately and continuously thereafter impaired, and that within a very few days the foot showed signs of such impairment in that the toes had a tendency to become cold and an ulcer developed on the heel which continued steadily to enlarge in area in spite of all efforts to overcome it.

It is respondent's theory of the case, on the other hand (and his theory was evidently accepted by the jury), that the circulation in the foot was impaired because of the fact that the first and second plaster casts placed upon his leg were too tight. He says that he constantly complained to appellant about this condition, but that appellant failed to remedy it. He minimizes the bleeding on June 11, and says that on that day appellant or one of his associates enlarged the opening at the heel of the cast, and in cutting away the cast at this point cut into the foot, which resulted in some bleeding. He says also that on this occasion one of the drainage tubes was removed from the open wound and that its removal was followed by a little bleeding. If respondent's version of the facts that transpired on June 11 is accepted, then it must be

said that there was no very considerable arterial hemorrhage, if any, on that day. Appellant says that much of the time respondent was delirious and irrational. Respondent maintains that his mind was clear and that he knew what was going on at all times save when he was under an anæsthetic. Respondent says that almost immediately after the placing of the first cast on May 29 and a number of days before the bleeding of June 11 symptoms of undue constriction appeared, and that he complained to the nurse and to the doctor that the cast was too tight, that his toes commenced to be swollen and discolored and painful, and that a sore or ulcer opened upon his heel. He says that portions of the first cast were cut away from time to time, and that, as this was done, the pressure seemed relieved and his foot felt and looked better, and that during the period from July 15 to 20, when no cast was on his leg, the condition of his foot very markedly and noticeably improved and the ulcer on the heel practically healed up. According to respondent's story, the second cast was even tighter than the first one, and he immediately and continuously complained about it, but nothing was done to relieve the pressure, and "it felt bad and was getting worse and worse every day." He says that his toes commenced to be markedly discolored and turned almost black, and the ulcer on his heel reopened and continued to get worse and worse, but that, in spite of his complaints, nothing was done to relieve the constriction. Appellant says that the second cast was split its full length within about forty-eight hours after it was put on. Respondent maintains however, that the second cast was not split or opened longitudinally until about the 21st or 22d of August, a day or two before its removal.

Respondent does not contend that either the use of the Boehler apparatus or the application of the casts constituted an improper course or method of treatment, but he does maintain that appellant, whether because of lack of care and attention or lack of skill, permitted the casts to be and remain too tight. That appellant exercised good judgment as to how tight the casts should be when he put them on would not excuse him from carefully watching conditions thereafter and loosening the casts if there were indications either that they had been put on too tightly or that because of swelling of the member they had subsequently become unduly con-

strictive. Appellant so concedes, in substance, but maintains that the facts were that the casts were at all times sufficiently loose to permit the insertion of dressings under them and that they were never tight enough to impair circulation. Dr. Dawley says that a cast unduly tight and impairing circulation could cause the condition that he found. Indeed, that is hardly a matter requiring expert opinion. Even the layman is familiar in a general way with what happens when the circulation of blood to any member of the body is seriously impaired by external pressure continued for any length of time. Dr. Dawley further says that, if the facts were as stated by respondent (and respondent is corroborated in many respects by the testimony of his sister, who came from Chicago to be with him, and was with him practically daily from May 18 to December 11) it would be his opinion that the trouble was caused by the casts being too tight. Appellant does not seriously question but that the trouble with the foot could have been caused by impairment of circulation by too tight a cast. He simply says that, as a matter of fact, in this particular case, the casts were not too tight and that the impairment of circulation arose, not by reason of constriction, but because of the rupture of a main artery feeding the area. It may be noted in this connection also that Dr. Dawley gives it as his opinion that the condition of the foot which he found when he was called into the case on August 31 was not the condition he would have expected to find if the proximate cause thereof was to be sought in a hemorrhage and breaking down of the posterior tibial artery on the previous June 11.

It is to be observed also that the injury here was to a part of the body not being treated. Cf. note, "Res Ipsa Loquitur— Malpractice," 26 Ill. Law Rev. 350 (1931). The treatment in this case was for a fracture a little below the knee. Gangrenous destruction of the foot is not a normal or usual result from such a fracture. It is a result that might very well follow if the casts (which admittedly were proper treatment for the fracture) were permitted to be or remain so tight as unduly to restrict circulation to the foot. Certainly where, as here, the toes were at all times observable, to permit a cast to remain so tight would be either unskillful or negligent, or both. Respondent and his sister maintained, as a matter of fact, that the casts were at all times too tight; that ob-

servable symptoms thereof appeared very shortly after the first cast was put in place and some days prior to the bleeding of June 11; that said bleeding was relatively a very minor matter; that conditions improved when the first cast was somewhat cut away and loosened and very markedly improved and in fact almost disappeared during the interval from July 15 to 20 when no cast was upon the leg; that the symptoms recurred when the second cast was put in place on July 20, and persisted to an increasing extent thereafter, to the ultimate destruction of the foot. If the jury so believed, they would be justified upon the record in this case in finding that the destruction of the foot resulted from the casts being too tight. On the other hand, if the jury accepted the testimony of appellant and his witnesses, they would be justified in believing that the casts were never tight and that the impairment of circulation and consequent destruction of the foot resulted from the breaking down of the supplying artery at and after the hemorrhage of June 11, which, in turn, was caused by the infection in the fracture area eating into the wall of the artery. The real controversy between the parties here is one of fact rather than medical theory or expert opinion. Upon the whole record in this case, we think it was for the jury to determine whether the gangrenous destruction of the foot resulted from impairment of circulation by reason of the breaking down of the artery, for which appellant would not be responsible, or whether it resulted from appellant's lack of skill or care, or both, in incasing the injured leg in casts too tightly applied and maintained, for which, of course, he would be responsible.

Appellant predicates error upon the court's refusal to give to the jury four requested instructions. The entire charge to the jury is set forth in appellant's brief. It is unusually full, fair, and complete. Every point of law embraced in or covered by the instructions requested by appellant is found and included in the instructions given by the court. We cannot believe that the jury was in any manner misled or appellant in any wise prejudiced because the court failed to adopt the exact language of the requests.

Respondent introduced in evidence over appellant's objection two photographs of the injured leg and foot taken shortly before the amputation thereof by Dr. Dawley and about four days

after appellant was discharged from further attendance upon the case. Appellant predicates error upon the admission of these photographs, which are known to the record as Exhibits A and B. He does not question the veracity of the photographs, but says that there was no dispute as to the nature, location, or extent of the injury to the leg, and that these photographs "invite the laymen jurors to view evidence of an unfortunate result as evidence of negligence and to draw conclusions of negligence from such pictures." We think it was within the discretion of the trial court to permit the introduction of these exhibits, particularly in view of the fact that there was some conflict between the testimony of appellant and Dr. Dawley as to the condition of the leg and foot at the time appellant was discharged and Dr. Dawley was called in. If appellant feared that these exihibits might be improperly considered by the jury, he could have requested the giving of a cautionary instruction in that regard, which request would undoubtedly have been granted. As a matter of fact, there is nothing in this record, either in the amount of the verdict or otherwise, to lead us to believe that the introduction of such exhibits misled the jury or prejudiced appellant.

█ The photographer who took the pictures Exhibits A and B was called by respondent for the purpose of identifying the exhibits, and did so. On cross-examination, after testifying that he took the pictures at the request of Dr. Dawley, he was asked, "Did he (Dr. Dawley) tell you why he wanted you to take the photographs?" To this inquiry respondent objected on the ground that it was incompetent and immaterial and not proper examination, which objection was sustained, and appellant predicates error on the ruling. We think the ruling was correct. Incidentally we may note that the witness thereafter testified fully and without objection as to all the facts and circumstances surrounding or connected with the taking of the photographs, including the facts that Dr. Dawley ordered them taken, paid for them, and superintended the placing and arrangement of the foot for the purpose. Also, so far as this record indicates, it is entirely possible that the witness might truthfully have answered the question, if permitted, by the word "No."

The foregoing appear to be the principal points upon which

appellant relies for reversal. We have carefully examined, however, all other claims of error made by appellant, even though they appear to go to relatively minor matters, and we find no merit in any of them.

Being of the opinion that the record fails to exhibit any prejudicial error, the judgment and order appealed from must be, and they are, affirmed.

ROBERTS, WARREN, and RUDOLPH, JJ., concur.

POLLEY, P. J., dissents.