PAUL DAIKER, appellant, v. DR. JOSEPH MARTIN, appellee.

No. 49278.

(Reported in 91 N.W.2d 747)

JULY 28, 1958.

REHEARING DENIED OCTOBER 17, 1958.

Welch & Welch, of Logan, and Leighton A. Wederath, of Carroll, for appellant.

Bradshaw, Fowler, Proctor & Fairgrave, of Des Moines, and Meyers & Tan Creti, of Carroll, for appellee.

OLIVER, J.—This is an appeal by plaintiff from a judgment on a verdict directed for defendant-physician in a malpractice action for damages allegedly caused by placing and keeping plaintiff's broken leg in a cast which was too tight, after defendant had done a closed reduction on fractured bones of the lower leg.

Friday evening, November 3, 1950, plaintiff, then age eighteen years, was injured in a high-school football game at Carroll, Iowa. His injury was a comminuted fracture of both bones of the left leg about nine inches above the ankle. It was a simple fracture, that is, one which did not break through the tissues to the air. Plaintiff was taken to St. Anthony Hospital in Carroll, where defendant, plaintiff's family physician, promptly set the broken bones and placed plaintiff's leg in a plaster cast extending from his groin to his toes, which were the only part of the foot not covered.

Plaintiff's complaint is not that the fractured bones were improperly set but that the plaster cast was so tight it prevented the circulation of the blood in the lower leg and foot, resulting in infections and subsequently in the amputation of the foot and nine inches of the leg. At the conclusion of the evidence for plaintiff the trial court directed a verdict for defendant on the grounds the evidence failed to establish defendant's negligence, or that his conduct was the proximate cause of the damage suffered by plaintiff and also that plaintiff had failed to show his freedom from contributory negligence. From the judgment rendered on the verdict plaintiff prosecutes this appeal. In determining its sufficiency to warrant submitting the case to the jury, the rule requires that the evidence be considered in the light most favorable to plaintiff. For that purpose only, the portions of the record herein set out or referred to are usually worded as though we found them true and correct. Actually, however, we express no opinion concerning the weight of the evidence or any

part of it. We merely find there is such evidence, the weight to be given any part or all thereof being for the determination of the jury.

It is our conclusion that the evidence, thus considered, was sufficient to require submission of the case to the jury and that the court erred in directing the verdict.

Plaintiff remained in the hospital under defendant's care for fifteen days after the fractures were reduced. He suffered pain most of this time and until the last day or two was given morphine and other drugs to relieve the pain and enable him to sleep. At 1 a.m., November 4, three hours after plaintiff's leg was placed in the cast, the nurse's record recited: "Circulation appears good. Leg elevated." The morning following his hospitalization the toes of his left foot were warm and he had some feeling in them and movement of them. Before noon his cast felt too tight below the knee and defendant relieved this pressure and pain, for a short time, by splitting the cast down from the knee about five inches. At 3 p.m. plaintiff again felt pressure and pain under the cast, this time at the place where the leg was broken.—"It was more painful and it felt like it wasn't just no room in there and everything was just pounding, pumping, pounding in my leg * * *."

About 6 p.m. defendant gave plaintiff a hypo, split the cast down four or five inches farther and spread the split about a quarter of an inch. The pain and the pounding stopped. By that time plaintiff's toes were swollen and noticeably red and he had less movement in them. That evening the burning and pounding in his leg returned, this time below the break. He was given sleeping pills and "shots" to relieve the pain.

Sunday morning, November 5, his toes were more swollen and were starting to turn blue. Sunday afternoon the burning and pounding in the leg was renewed and there was also pain in the ankle and foot. There was loss of feeling in the toes. That evening the toes were darker and the fifth (little) toe was almost black. Plaintiff was given morphine at 4:10 and 9 p.m. His foot was becoming painful. The nurse's record, at 3:45 a.m., November 6, recites: "Morphine gr. ⅙ given for pain. Toes becoming more cyanotic and mottled. Becoming cold. Dr. J. Martin notified. Sling applied by Dr. Martin. More comfortable. Sleeping

at intervals." During this 3:45 a.m. call defendant also split the cast for the third and last time, down over the ankle to an inch or two from the lower end. This relieved the pressure temporarily. Monday morning there was pain around the arch and ball of plaintiff's foot and it was burning and pounding and felt too tightly confined and under pressure. Monday night "the pain came right up to the toes" which no longer had a sense of feeling. The nurse's record at midnight states: "Left foot still appears blotchy."

Plaintiff's father frequently voiced his concern over the apparent condition of plaintiff's foot and was repeatedly assured by defendant that it would be all right and he should not worry. November 7 defendant told plaintiff the leg was swelling inside the cast. He did not at any time tell plaintiff the break in his leg had done anything to the circulation. Plaintiff continued to suffer burning and pounding pains in the leg and foot, for which he was given morphine and other sedatives. The last few days he was in the hospital the pain was not as distressing as it had been and less medicine was required to keep the pain down—"My little toe kept getting sore, got a scab, kind of drained a little bit, had pus on the little toe, and I still had pain." The nurse's record of November 13 recites, "Small toe of left foot very discolored, able to move entire foot but unable to bend toes." November 17, "small toe on—leg bruised and pus oozing from it. Sulfathiazole applied to little toe of left foot by Dr. Joe Martin."

The following day (November 18) plaintiff was discharged from the hospital. The next week "the end of the little toe, first joint, which was ulcerated, dropped off." About November 25 plaintiff's cast was changed. This was done at the hospital. When the old cast was removed an ulcer was found at the back of the heel cord and a yellow liquid was removed from the bottom of the foot. The calf of his leg was raw and scabby and, with the ulcer, "emitted an odor." The ankle and foot were red and swollen and the toes were blue. The foot was thick and square like a clubfoot. The cast was again changed December 7. At that time what remained of the fifth toe appeared to be healing and was a dark color—"Late in December I got an ulcer

beside my little toe and the fifth metatarsal which started to give out odors." Defendant took out a piece of the cast so he would have access to the base of the toe where the ulcer was.

February 1, 1951, the cast was again removed and a knee-length cast was substituted for it. Defendant stated he had worried he would "have to take that foot off." Shortly thereafter plaintiff developed a high temperature. Defendant examined him, dressed the wounds on the back of his heel, the heel cord, and the fifth metatarsal, and gave plaintiff some fever pills and shots of penicillin. Plaintiff was confined to his bed at home for a week. Defendant told him there was nothing wrong, that he had the flu. He went to defendant's office where the cast, placed on the leg only a few days previously, was removed. As defendant unwrapped plaintiff's foot he said, "Well, I found it", an abscess on the bottom of the foot. Plaintiff was taken to the hospital where the foot was lanced, the pus was taken out and antibiotics, etc. were given him. The hole in the heel was treated and a salve was also put on the fifth metatarsal and was changed frequently. On this occasion plaintiff remained in the hospital twenty-six days until March 8.

April 6, 1951, plaintiff went to the State University Hospital at Iowa City. Dr. Robert W. Newman, who attended him, testified there was a reddish-blue discoloration over the top of his foot and over the second, third and fourth toes and the remaining stump of the fifth toe. There was complete anesthesia of the toes and of the foot from the middle forward, also a circular ulceration on the outside of the foot near the mid portion of the base, in which there was necrotic material. The bone was not covered and could be contacted with sterile instruments. On the undersurface was a small wound from which a gauze pack projected and which exuded thin, yellow pus, on pressure. You could not feel the arteries or any pulse in the foot. Doctor Newman's diagnosis was, "fracture, simple, mid shaft left tibia and fibula, united, a fair alignment. Osteomyelitis, left fifth metatarsal head. Abscess, sub-plantar left foot. Amputation, distal phalanx, fifth toe, left." April 9 an operation was performed, dead tissue and infected soft tissue was removed, also the head of the fifth metatarsal bone, from which the fifth toe had projected.

Plaintiff made approximately twenty-five trips to the State University Hospital where four operations were performed on his foot and ankle. He also consulted doctors in Omaha and went through the Mayo Clinic at Rochester, Minnesota. Finally it was decided to amputate the leg. This decision was based largely upon evidence of persistent recurring infection in the foot which had become deformed and was painful, and the fact that the ankle had become stiff. The amputation was done July 14, 1953.

Doctor Newman testified organisms are present in the blood from time to time and that perhaps the most important protective mechanism to fight them off is the integrity of the circulatory system. The best protection for any infection or healing is good blood supply. When it is cut off the germ lives and lives and grows.

He was asked if casts should be split if swelling develops after fractures:

"A. Yes, anything that would tend to impair the circulation and a rigid cast, of course, wouldn't allow the blood to come down. You would split the cast if you were convinced the circulation was being impaired—if * * * there is still persisting evidence of impaired circulation, pain and so on, provided there were no contraindications, I should think the cast probably would be split. * * * if you give hypos to relieve pain it's for that specific reason, considering the fact that pain is an indication, it's a warning sign, it's a danger signal.

"Q. That would be the danger of giving hypos? It would be that you might mask the actual seat of the trouble? A. That would be one of the dangers, yes."

I. Kirchner v. Dorsey & Dorsey, 226 Iowa 283, 294, 295, 284 N.W. 171, 178, quotes from Berg v. Willett, 212 Iowa 1109, 1112, 232 N.W. 821, 823, as follows:

"The burden in this case was upon appellant to make out a case of negligence or unskillfulness by the preponderance or greater weight of the evidence. The physician does not, in accepting employment, impliedly guarantee a cure in any case or of any disease. He is bound only to employ that degree of skill ordinarily possessed by practitioners generally under like

circumstances in the locality in which he practices his profession. It is, however, one thing to say that an adverse result is not, in itself, evidence of negligence or want of skill on the part of a physician, and another to combine the result with other facts and circumstances in determining the fact question. We think it is and must be the rule that while the result alone is not, in itself, evidence of negligence, yet same may, nevertheless, be considered, together with other facts and circumstances disclosed by the evidence in a given case in determining whether or not such a result is attributable to negligence or want of skill."

See also Prather v. Downs, 164 Wash. 427, 2 P.2d 709, 712.

Frost v. Des Moines Still College, 248 Iowa 294, 302, 303, 79 N.W.2d 306, 312, states: "We think it is a just and logical conclusion that one who, while undergoing a surgical operation, sustains an unusual injury to a healthy part of his body not within the area of the operation, be not precluded from invoking the doctrine of res ipsa loquitur in an action against the doctors and nurses participating in the operation."

In Stickleman v. Synhorst, 243 Iowa 872, 878, 879, 52 N.W.2d 504, 508, a malpractice case, the court said with reference to the argument that medical testimony was necessary to show how plaintiff was injured and that defendant was negligent:

"We are aware of no rule that the nature of an injury must be shown by medical testimony if the injury is such that it may satisfactorily be shown by other evidence.

"* * *.

"Two exceptions to the rule requiring expert evidence in actions of this kind are applicable here. Where a physician's lack of care is so obvious as to be within the comprehension of laymen and to require only common knowledge and experience to understand, expert testimony is not necessary. Also, where a physician injures a part of the body not under treatment expert evidence is not always required. See in this connection Evans v. Roberts, supra, 172 Iowa 653, 660, 154 N.W. 923, 926, 11 N. C. A. A. 728, 736 [and other authorities]."

In the Evans case the doctor cut off a portion of the patient's tongue when operating for adenoids.

Bartholomew v. Butts, 232 Iowa 776, 5 N.W.2d 7, was based

upon postoperative treatment of a broken upper arm by taping the forearm against it in a position of acute flexion which allegedly caused a circulatory obstruction resulting in a Volkmann's contracture or claw hand. The negligence claimed was the failure to remove or loosen the bandage when the arm and hand became swollen and the fingernails blue. The court stated (232 Iowa 783, 5 N.W.2d 11): "It is apparent that failure to loosen or remove a tight bandage holding a badly swollen arm at an acute angle could easily obstruct the circulation."

In 54 A. L. R.2d 200 to 267 is an annotation entitled, "Malpractice; treatment of fractures or dislocations", and at pages 251 to 260, "Injury from too tight, etc., immobilizing *. * * device, etc."

In Van Der Bie v. Kools, 264 Mich. 468, 474, 250 N.W. 268, 270, another Volkmann's contracture case, the injured arm was bound tightly across the patient's chest and the bandages were not relieved, despite severe swelling, sores and pus. There was no expert testimony the condition complained of was, in fact, caused by the treatment. The court stated none of the medical experts testified the treatment as shown by plaintiff's testimony was proper. "In fact, laymen would know that it was not."

In Lundgren v. Minty, 64 S. D. 217, 221, 222, 224, 266 N.W. 145, 147–9, eight days after both bones in plaintiff's lower leg were fractured defendant took over the case and performed an open reduction of the fractures, in the area of which gas and pus had accumulated since the injury. Several casts were placed on the leg. The foot became badly ulcerated and exhibited symptoms which the court said would be anticipated from an appreciable impairment of the circulation of the blood in the foot. Later another doctor was employed who found it necessary to amputate the leg. The opinion states:

"In the last analysis, the differences between appellant and respondent in their theories as to the ultimate facts of this case come to a definite focus on the question of the cause of the impaired circulation in the foot. * * * He [appellant] maintains that the leg was badly infected in the area of the fracture when respondent was brought to him", that the infection destroyed the wall of a large artery, that the circulation of blood to the

foot was impaired and showed signs of such impairment in that the toes had a tendency to become cold and an ulcer developed on the heel. Respondent's theory was that the circulation was impaired because the plaster casts placed upon his leg were too tight. He testified that almost immediately symptoms of undue constriction appeared, and he made complaint that the cast was too tight, that his toes commenced to be swollen and discolored and painful and that a sore or ulcer opened on his heel, that the second cast was even tighter, that it felt bad and his toes became markedly discolored and were almost black and the "ulcer on his heel reopened."

"Dr. Dawley says that a cast unduly tight and impairing circulation could cause the condition that he found. Indeed, that is hardly a matter requiring expert opinion. Even the layman is familiar in a general way with what happens when the circulation of blood to any member of the body is seriously impaired by external pressure continued for any length of time. * * * Appellant does not seriously question but that the trouble with the foot could have been caused by impairment of circulation by too tight a cast. He simply says * * * the casts were not too tight and that the impairment of circulation arose * * * because of the rupture of a main artery feeding the area. * * *

"It is to be observed also that the injury here was to a part of the body not being treated. [Citation] The treatment in this case was for a fracture a little below the knee. Gangrenous destruction of the foot is not a normal or usual result from such a fracture. * * * Certainly where, as here, the toes were at all times observable, to permit a cast to remain so tight would be either unskillful or negligent, or both."

The court stated the real controversy was one of fact rather than medical theory or expert opinion and that it was for the jury to determine whether the gangrenous destruction of the foot resulted from the impairment of circulation by reason of the breaking down of the artery or because of casts which were too tight.

II. No malpractice case involving the sloughing off of part of a member of the human body not within the area of treatment by a physician, but as an alleged result of such treatment, has been brought to our attention. It is a matter of com-

mon knowledge that such things do not ordinarily occur in connection with treatment by physicians exercising ordinary skill. One need not have scientific knowledge to know that any such result is ordinarily unnecessary if the physician exercises reasonable care.

In the case at bar the record shows defendant partially split the cast three times but there is evidence indicating these loosenings were not sufficient and that thereafter defendant knew the leg was swelling inside the cast and causing pain, but failed to loosen the cast. There is also evidence plaintiff was given drugs to relieve the pain. Doctor Newman testified one of the dangers of such procedure is that the actual seat of the trouble causing the pain might be masked. He testified the best protection for any infection or healing is good blood supply and a cast that impaired the circulation should be split. He testified also that when he first examined plaintiff (shortly after plaintiff's second confinement in St. Anthony Hospital under defendant's care) there was no perceptible blood supply in the foot, there was complete anesthesia in the forward half of it, and in the foot were pus pockets, sores, dead tissue, etc.

Lundgren v. Minty, supra, 64 S. D. 217, 266 N.W. 145, is factually similar to the case at bar. One difference is that in the case at bar the record does not show infection in plaintiff's leg when the bones were set nor any opening through which infection could enter from the outside. In the case at bar there was evidence such a fracture *could* impair the circulation. In the cited case there was evidence infection destroyed a wall of an artery and *did* impair the circulation. Here, as there, the question of defendant's negligence was one of fact rather than medical theory or expert opinion and was for the jury to determine.

III. The foregoing statement is applicable also to the question of proximate cause. We have frequently held that issue is ordinarily for the jury where there is substantial evidence of a defendant's negligence. Wilson v. Corbin, 241 Iowa 593, 604, 41 N.W.2d 702, 708.

IV. Counsel for defendant concede the question of plaintiff's contributory negligence was for the jury.

The judgment is reversed and the cause remanded.—Reversed and remanded.

All JUSTICES concur.