**Steve VAN ZEE and Judy Van Zee, Plaintiffs and Appellants,**

v.

**SIOUX VALLEY HOSPITAL, a South Dakota corporation, Defendant and Appellee,**

**and**

**Orthopedic and Fracture Center, P. A., a South Dakota professional association; and John Billion, Defendants.**

**Nos. 13270, 13279.**

Supreme Court of South Dakota.

Argued Nov. 18, 1981.

Decided Feb. 3, 1982.

Sidney B. Strange of Strange & Strange, Sioux Falls, for plaintiffs and appellants.

Sarah L. Richardson of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendant and appellee; Carleton R. Hoy of Davenport, Evans, Hurwitz & Smith, Sioux Falls, on brief.

HENDERSON, Justice.

## ACTION

Appellants Steve and Judy Van Zee appeal from a judgment based on a jury verdict which found that appellee Sioux Valley Hospital was not negligent in its care of Steve Van Zee.[1] This appeal is predicated on appellants' contention that the jury

---

1. Several other parties were originally named as defendants to this action; during the course of litigation and appeal, however, these other defendants were either ordered or dismissed out and only Sioux Valley Hospital remains.

should have been instructed on the doctrine of res ipsa loquitur. We agree, reverse and remand.

## FACTS

While attempting to perform some farm maintenance on a blender box of a feeder wagon, Steve Van Zee injured his left hand and forearm when he became caught in the spokes of the blender. This accident occurred on March 13, 1976. Van Zee was immediately taken to a hospital in Miller, South Dakota, where his injury was x-rayed, cleaned and sutured. Three injections were administered to Van Zee at this time: a combination painkiller and muscle relaxant, a tetanus booster and a general anesthetic. The latter injection was given intravenously at the inner side of the elbow joint of the right arm while the other two injections were given in the hip muscle. To allow for treatment at the Miller hospital, Van Zee had to be forcibly restrained because of the extreme pain involved.

Due to the severity of the injury, Dr. James E. Monfore arranged to have Van Zee taken to the Sioux Valley Hospital in Sioux Falls, South Dakota, where orthopedic surgeon Dr. John Billion became Van Zee's attending physician. Dr. Billion examined Van Zee on March 13, 1976, and admitted him into the Sioux Valley Hospital. At this time, and up to the time of the operation at Sioux Falls, there was no apparent pain or dysfunction of the right arm and shoulder of Van Zee. For all purposes, it was a normal arm.

On March 18, 1976, surgery was performed on Van Zee's left hand and forearm, during which time Van Zee was unconscious. Van Zee did not recall any injections being given to him in his right arm or shoulder prior to surgery. Upon regaining consciousness that same day, Van Zee immediately noticed a deep pain in his right arm. At this time, a pinprick was observed by both Steve and Judy Van Zee on Steve's right shoulder. The hospital personnel, including Dr. Billion, were notified of the pain in Van Zee's right shoulder; consequently, x-rays were taken and physical therapy administered to the right arm. Van Zee was discharged from the hospital on March 23, 1976.

The pain in Van Zee's right arm persisted and became more severe after he left the hospital in Sioux Falls. Due to this increased pain, Van Zee was examined in Miller by Dr. Monfore on March 27, 1976. By this time, Van Zee's right arm had become nearly immobile. Dr. Monfore noted that a puncture mark and small bruise were visible on the right shoulder of Van Zee. Van Zee was admitted into the Miller hospital. The admitting diagnosis of Dr. Monfore read in part: "acute right shoulder pain, possibly secondary to injection site of hypo." During his stay in the hospital, Van Zee received pain control drugs and cold packs. Van Zee was discharged from the hospital on April 1, 1976, at which time Dr. Monfore diagnosed that his patient's right arm "was practically useless to him." Dr. Monfore also arranged for Van Zee to have his right arm examined by Dr. Billion.

Van Zee was examined by Dr. Billion on April 2, 1976, and again on April 21, 1976. Dr. Billion observed that Van Zee was experiencing much pain in his right shoulder and recommended physical therapy. Van Zee was referred by Dr. Billion to Dr. Kenneth G. Koob, a neurologist in Sioux Falls. On May 3, 1976, Dr. Koob examined Van Zee and determined that Van Zee was experiencing pain and immobilization to his right arm. Dr. Koob could not, however, establish the cause for the dysfunction of the limb.

On December 5, 1977, Van Zee was examined by Dr. Shelly Chou, a neurosurgeon in Minneapolis, Minnesota. Dr. Chou found that Van Zee had suffered a loss of sensation in his right shoulder, which showed marked atrophy. At this time, Dr. Chou diagnosed Van Zee's injury as a nerve injury in the right shoulder area. Van Zee was admitted to the University of Minnesota hospital on January 8, 1978, to allow Dr. Chou to conduct further testing. On January 11, 1978, exploratory surgery was conducted on Van Zee's right shoulder so as to expose the damaged nerves and better diag-

nose the injury. This operation indicated that the circumflex nerve in Van Zee's right shoulder had deteriorated to the point of nonfunction. Van Zee was discharged from the University hospital on January 13, 1978.

This action was commenced in March of 1978. Trial was held in August of 1980 during which time Van Zee testified that he still experienced pain in the right shoulder area.

## ISSUE

Did the trial court err in refusing to instruct the jury on the doctrine of res ipsa loquitur? We hold that it did.

## DECISION

A trial court is to present only those issues to the jury by way of instruction which find support by competent evidence in the record. *Wolf v. Graber*, 303 N.W.2d 364 (S.D.1981); *Olesen v. Snyder*, 277 N.W.2d 729 (S.D.1979). A failure to give a requested instruction setting forth the applicable law constitutes prejudicial error. *Wolf v. Graber*, supra; *Miller v. Baken Park, Inc.*, 84 S.D. 624, 175 N.W.2d 605 (1970), mod. 85 S.D. 133, 178 N.W.2d 560 (1970).

The three essential elements which must be present to warrant application of the doctrine of res ipsa loquitur are: (1) the instrumentality which caused the injury must have been under the full management and control of the defendant or his servants; (2) the accident was such that, according to knowledge and experience, does not happen if those having management or control had not been negligent; and (3) the plaintiff's injury must have resulted from the accident. *Fleege v. Cimpl*, 305 N.W.2d 409 (S.D.1981); *Kramer v. Sioux Transit, Inc.*, 85 S.D. 232, 180 N.W.2d 468 (1970). Also, the doctrine of res ipsa loquitur is to be utilized sparingly and only when the facts and demands of justice make its application essential. *Shipley v. City of Spearfish*, 89 S.D. 559, 235 N.W.2d 911 (1975); *Barger v. Chelpon*, 60 S.D. 66, 243 N.W. 97 (1932).

In cases involving medical negligence, which is the cause of action pleaded here, an additional element is required for the doctrine of res ipsa loquitur to be applied: namely, negligence must be established by the testimony of medical experts, unless the kind of negligence involved is within the realm of laymanistic comprehension. *Block v. McVay*, 80 S.D. 469, 126 N.W.2d 808 (1964); *Lundgren v. Minty*, 64 S.D. 217, 266 N.W. 145 (1936); *Bennett v. Murdy*, 61 S.D. 471, 249 N.W. 805 (1933); *Myrlie v. Hill*, 58 S.D. 330, 236 N.W. 287 (1931). This requirement is expounded upon in Prosser, Law of Torts, pp. 226–228 (4th ed. 1971) (footnotes omitted):

> This question of duty arises frequently in cases of medical malpractice. Since a physician or surgeon normally undertakes only to exercise the skill and care common to the profession, there usually is not enough in a mistaken diagnosis alone, or the unfortunate choice of the wrong method of treatment, or the kind of accident or undesirable result which happens in spite of all reasonable precautions, to show the necessary lack of skill or care. What this means is that ordinarily laymen are not qualified to say that a good doctor would not go wrong, and that expert testimony is indispensable before any negligence can be found. Such decisions, together with the notorious unwillingness of members of the medical profession to testify against one another, may impose an insuperable handicap upon a plaintiff who cannot obtain the proof.
>
> There are, however, some medical and surgical errors on which any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care. When an operation leaves a sponge in the patient's interior, or removes or injures an inappropriate part of his anatomy, or when a tooth is dropped down his windpipe, or he suffers a serious burn from a hot water bottle, or when instruments are not sterilized, the thing speaks for itself without the aid of any expert's advice.

■ Appellants factually contended at trial that Steve Van Zee, while unconscious during surgery at the Sioux Valley Hospital, had received an injection in his upper right arm which caused the pain and nerve damage to his right arm. As indicated by the following quote from 45 A.L.R.3d 731, 739–740 (1972) (emphasis added), for the doctrine of res ipsa loquitur to be applied, it was incumbent on appellants to establish by expert testimony that the Sioux Valley Hospital was negligent in its treatment of Steve Van Zee:

> [I]n situations where a patient sustained an injury after an injection the courts have usually refused to apply the doctrine of res ipsa loquitur since the full spectrum of possible consequences from the giving of a shot were not within the layman's common knowledge and since many unforeseen and undesirable reactions from an injection could result from many causes other than negligence, such as the emotions, allergies, and internal condition of the patient before and after an operation, and developments occuring after the injection, *the courts thus holding that at least a minimum showing by expert testimony was generally required that there had been some variance from recognized standards of care which proximately caused the injury.*

*See Bialer v. St. Mary's Hospital,* 83 Nev. 241, 427 P.2d 957 (1967).

Four doctors testified at trial. Dr. Kenneth G. Koob, who examined Van Zee approximately two months after the March 1976 operation, testified:

> "[T]here was no anatomic or physiologic way, that was not and is not in any way that I'm aware of that an injection in this shoulder can specifically affect this group of nerves which is the group that had to be affected to produce the symptoms and the findings that Mr. Van Zee had."

Dr. John Billion, who performed the surgery on Van Zee's left hand and forearm, testified that any injection given to Van Zee while he was in the Sioux Valley Hospital did not cause the damage to Van Zee's right arm. We note, however, that Dr.

Billion stated in his discharge summary of Van Zee from the Sioux Valley Hospital on March 23, 1976: "While hospitalized, the patient had an I.M. medication to the right deltoid which resulted in some hypesthesia in the area of the axillar nerve supply to the lateral aspect of the right upper arm. This will be followed on an outpatient basis." Furthermore, after examining Van Zee on April 2, 1976, Dr. Billion dictated this revealing treatment note:

> "Incidentally, his right shoulder was giving him a lot of pain, I could find no neurological deficit with the exception of some paralysis of the deltoid and axillary nerve anesthesia on the lateral upper arm. I think they probably did involve the axillary nerve at the time of this single injection and we're going to see how he does. I cautioned him that usually this will improve. He is going to go to a pulley, overhead, and cuff exercises and we'll see how he gets along in 2–3 weeks."

Dr. Shelly Chou, who examined and conducted exploratory surgery on Van Zee, testified (via deposition read to the jury) that, in his opinion, an injection had not caused the damage to the nerves in Van Zee's right arm because of two reasons: (1) the injection would have had to have been with an extremely long needle (one and one-half to two inches), and (2) the nature and structure of the nerve would have necessitated placing the tip of the needle squarely into the nerve's base to cause the resulting damage. Dr. Chou could not, however, formulate an opinion as to what caused the nerve dysfunction or if it was chronically or acutely damaged. He definitely found nerve injury and atrophy to the right arm. See FACTS.

Extremely pertinent is the testimony of Dr. James E. Monfore. Dr. Monfore treated Van Zee immediately following the accident and also examined him subsequent to the operation on his left hand and forearm. The testimony is as follows:

> Q. [Appellants' counsel]: [D]o you have an opinion based upon reasonable medical certainty as to whether or

Q. not Steve Van Zee, or your patient, sustained an injury to his right arm due to the administration of an IM injection into that arm on March 18, 1976, and you can answer that question yes or no?

A. [Dr. Monfore]: Yes.

Q. What is that opinion?

A. I think there is a direct relationship—causative relationship between the injection and the effects that the right shoulder had shown and does show.

Q. What is your basis for that opinion?

A. The basis is that he has a permanent injury to that right shoulder which I do not think will recover. I think it is caused by an isolated injury to the axillary nerve without any other involvement. There is no admission of other incidents or accidents to that shoulder. I am satisfied in my mind that he had an injection to that shoulder and that was the advent of his shoulder problems which have continued to this date.

Q. Are you familiar with the standard of care in eastern South Dakota relative to the admission of intramuscular injections?

A. Yes, I think so.

Q. Would that likewise be true with respect to the injections of the drug we have called Demerol?

A. Yes.

Q. What is that standard of care, and what was that standard of care in March of 1976?

A. Demerol can be given IM, intramuscularly, or IV, intravenously. Certain sites are selected, usually upper outer gluteus muscles, the deltoid muscles, or the anterior muscles of the thigh.

Q. Why are those muscles normally selected?

A. Because of the large muscle mass available to receive the injection and the relative safety involved.

Q. Would it ever be proper to inject Demerol into some tissue other than muscle?

A. No, not in my opinion, except if it were IV.

Q. Why is that, in your opinion?

A. Because the drug is absorbed through the muscle, and I don't think it should be injected into joints or bones or tendons or nerves. It is either intramuscular or intravenous. That has been my teaching.

Q. Do you have an opinion based upon reasonable medical certainty as to what effect the administration of an IM injection—what effect the administration of an IM injection had upon the body of Steve Van Zee?

A. I think it caused complete destruction of the axillary nerve.

Q. And what would be the results of destroying a man's axillary nerve?

A. It would leave him without the use of the deltoid and teres minor muscle. It would render his shoulder crippled so that he could no longer elevate his arm.

This expert testimony, we hold, sufficiently established a minimum showing that a variance from a recognized standard of care existed. Although three other physicians specifically opined that an injection had not caused the damage to the right arm of Van Zee, Dr. Monfore's causative diagnosis effectively pierced the shroud of silence that often surrounds the testimony of physicians who are hesitant to testify against another member of the medical profession.[2]

It is contended by appellee, however, that the res ipsa loquitur instruction was properly refused by the trial court since the in-

2. *See Reynolds v. Struble*, 128 Cal.App. 716, 18 P.2d 690 (1933); *Morgan v. Rosenberg*, 370 S.W.2d 685 (Mo.App.1963); *Simons v. Freidrich*, 163 Misc. 112, 296 N.Y.S. 367 (1937); *Coleman v. McCarthy*, 53 R.I. 266, 165 A. 900 (1933); *Halldin v. Peterson*, 39 Wis.2d 668, 159 N.W.2d 738 (1968). Seidelson, Medical Malpractice Cases and the Reluctant Expert, 16 Cath.U.L.Rev. 187 (1966); Markus, Conspiracy of Silence, 14 Cleve.Marsh.L.Rev. 530 (1965).

strumentality which caused the injury was not shown to be within its control. In this regard, registered nurse Kristie Hoelker, who was the on-duty surgical nurse at the time of the March 1976 operation, testified (by referring to certain hospital records charts) as follows:

Q. [Appellants' counsel]: And you don't recall moving Mr. Van Zee in any manner so as to expose a portion of his lower anatomy to receive the injection, do you?

A. [Nurse Hoelker]: I do not remember Mr. Van Zee.

Q. So based on what you normally do, you are estimating that you gave the shot either in his thigh or in his gluteus muscle; is that right?

A. I'm not estimating. I know that I gave it either in the thigh or in the gluteus muscle.

Q. Have you ever gave a shot of Demerol into a man's arm?

A. No.

Q. Never?

A. No. The only time I can say that I possibly could have is if there was a person that was in a body cast, or if there would be some skin grafting in those other areas, or something of that order.

Furthermore, appellee urges that the damage to the right arm of Van Zee could have occurred outside the scope of its control, to wit: Van Zee received intramuscular and intravenous injections at the Miller hospital immediately following the accident; Dr. Koob testified that extended improper sleeping positions (lengthy nerve compression) could have possibly caused the nerve damage; an unknown virus; the forcible restraint of Van Zee at the Miller hospital; and the nature of the injury itself, which caused Van Zee to pull extensively with his right arm in attempting to release himself from the blender box. Any of these factors, singularly or in combination, might have caused the injury, contends appellee.

We are not persuaded by these spectres of causation. As the New York Court of Appeals stated in a negligence case involving a hospital as a defendant:

Circumstantial evidence is sufficient if it supports the inference of causation or of negligence even though it does not negative the existence of remote possibilities that the injury was not caused by the defendant or that the defendant was not negligent. 'It is enough that he [plaintiff] shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred.'

*Dillion v. Rockaway Beach Hospital & Dispensary*, 284 N.Y. 176, 179, 30 N.E.2d 373, 374 (1940) (citations omitted) (brackets in original); *see Ohligschlager v. Proctor Community Hospital*, 55 Ill.2d 411, 303 N.E.2d 392 (1973).

Notwithstanding the testimony of Nurse Hoelker, the facts establish that no pain whatsoever was felt by Van Zee in his right arm or shoulder until immediately after the operation ("it felt like I got a shot, and it went clear to the bone") when both Steve and Judy Van Zee noticed for the first time a red pinprick on Steve's upper right arm. Moreover, this area was swollen, warm to the touch and increased the pain to the shoulder area when it was touched. These circumstances provided ample supportive evidence to create a reasonable inference that the hospital was responsible for causing the damage to the right arm of Van Zee.

The judgment of the trial court is reversed and the case is remanded for a new trial whereat the jury is to be instructed on the doctrine of res ipsa loquitur.[3]

DUNN, MORGAN and FOSHEIM, JJ., concur.

WOLLMAN, C. J., dissents.

---

**3.** Our holding is dispositive of appellee's notice of review.

WOLLMAN, Chief Justice (dissenting).

I find nothing in the testimony that indicates that administering an intramuscular injection of Demerol into the deltoid muscle of the upper arm constitutes negligence. For example, Dr. Koob testified that there is nothing inappropriate about giving an injection one to three inches below the shoulder in the lateral aspect of the arm. Dr. Monfore's testimony is to the same effect. How, then, can it be said that Sioux Valley was negligent in anything that its employees did? Accordingly, I would hold that plaintiffs failed to satisfy the fourth element of the res ipsa loquitur test.