KOSAK, Respondent, vs. BOYCE, Appellant.

*December 12, 1924—January 13, 1925.*

*Physicians and surgeons: Malpractice: Failure to procure X-ray of injured eye: Damages: Pain and suffering: Special verdict: Form: Omnibus questions: Failure to poll jury: Waiver of irregularity.*

1. In an action against a physician for malpractice, the evidence is *held* sufficient to sustain a finding that the defendant was negligent in failing to take an X-ray photograph of plaintiff's injured eye.   p. 519.
2. Where the physician examined the patient's eye with an opthalmoscope and negligently failed to find a particle of steel which was later discovered and removed by another physician after taking an X-ray photograph, the first physician was liable for the pain and suffering of the patient caused by his failure to find and remove such particle; but

since the testimony of the experts was to the effect that there would have been no difference in the disability sustained by the plaintiff had the particle been removed soon after the injury, it is *held* that there is no basis for the assessment of damages for the impairment of the eyesight.   p. 522.

3. The damages awarded plaintiff for such pain and suffering should not be reduced by the compensation paid him under the workmen's compensation act (sub. (3), sec. 2394—25, Stats.), as this element of damages is not compensable under the act.   p. 522.

4. Where the special .verdict contained two elements of negligence, the question as to whether the patient's disability and impairment of his eyesight was increased as a result of defendant's negligence should have been divided so as to make independent inquiry concerning the effect of each ground of negligence.   p. 523.

5. A party who fails to poll the jury to establish whether different answers in a special verdict were concurred in by the same jurors, cannot thereafter claim error on the ground that the replies of the jury do not show that the same ten jurors agreed to each answer; failure to challenge the regularity of the verdict in this respect being a waiver of the irregularity.   p. 524.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Reversed, with directions.*

Malpractice.   On November 23, 1920, the plaintiff was foreman of the core-makers at the French Battery & Carbon Company, in the city of Madison.   In the forenoon of that day, while helping a man to put a new spring in a machine, the spring parted and one part thereof struck him across the eye.   The eye pained him, and in the afternoon of that day plaintiff called upon the defendant, who is a physician and surgeon specializing in eye, ear, nose, and throat diseases. He told the defendant he thought there was a piece of steel in his eye and explained to defendant the manner in which the injury occurred.   The defendant looked at the eye and saw a scratch across the center of the cornea of such character as to obstruct the vision.   A test revealed a vision of

20—40 in the injured eye and 20—20 in the other. The pupils reacted properly to light and the tension was normal. Defendant examined the eye to ascertain whether the cornea was perforated and concluded that it was not. He examined the interior of the eye by use of the opthalmoscope, direct illumination, and oblique focal rays. No foreign matter was discovered in the eye. The anterior chamber was the same depth as the other eye. There was no evidence of any injury to iris or lens. The pupil was perfect and the anterior chamber was perfectly free from blood or any foreign substance. The defendant concluded that there was no perforation of the cornea, nothing of a foreign nature in the eye, and that the eye had suffered no internal injury. He applied acid to the scratch on the cornea, and put on a bandage, telling the plaintiff to report again in twenty-four hours.

Plaintiff called on the defendant the next day, November 24th, and also on November 26th. On each occasion, according to his testimony, he complained of pain, and stated to the defendant that he thought there was something in the eye. On each occasion the defendant examined the eye by the use of the opthalmoscope, using direct illumination and oblique focal rays, but discovered nothing in the eye. He did not again examine the eye to discover whether the cornea had been perforated. He concluded that the scratch on the cornea accounted for the pain and for the sensation which caused plaintiff to believe that there was something in the eye. He treated the eye merely with the view of healing the scratch on the cornea.

Plaintiff called again on December 27th and December 29th, stating upon the occasion of each visit that the eye pained him and he thought there was something in the eye. Defendant examined the interior of the eye by the same methods but discovered nothing. Again, on February 9th plaintiff called and, according to his testimony, again complained of pain and insisted that there was something in the

eye.   The defendant again examined the eye and discovered an opacity in the lens.   The evidence shows that upon the occasion of this visit one or the other or both of the parties became angry, the plaintiff left the office and did not again return.

On February 11th the plaintiff called upon Dr. Davis, an eye surgeon in the city of Madison, complaining of pain in the eye and expressing the opinion that there was something in his eye.   Thereafter, and until February 26th, the plaintiff made frequent calls at the office of Dr. Davis, and upon each occasion Dr. Davis made a careful examination of the eye with the opthalmoscope in practically the same manner and by practically the same method employed by the defendant.   During the course of these examinations Dr. Davis discovered two opacities in the lens of the eye, but did not discover anything in the nature of a foreign substance therein until the 26th day of February.   On that day he located what appeared to be a foreign substance at a point in the lens corresponding with the figure 10 on the dial of a watch.   He thereafter caused two or three X-rays to be taken of the eye which revealed the existence of a foreign object in the eye.   On April 8th a little piece of steel was removed from the eye by the use of a magnet.   On the 10th day of May, 1921, what is known as a needle operation was performed on the eye.   On June 27, 1921, the lens of the left eye was removed.   Plaintiff left the hospital July 2d and was thereafter treated by Dr. Davis until about the 1st of September, 1921.

The jury returned the following special verdict:

"1. Did the foreign body removed from the left eye of *Mr. Kosak* by Dr. Davis on April 8, 1921, enter *Mr. Kosak's* eye on November 23, 1920?   *A.* Yes.

"2. If you answer question 1 'Yes,' did *Dr. Boyce* in the course of his treatment fail to exercise such reasonable care and skill as was usually possessed and exercised by physicians and surgeons who specialized in the treatment of the

eye and who were in good standing and of the same school of practice in the vicinity of Madison, having due regard to the advanced state of medical and surgical science on November 23, 1920:

"(a) By failing to properly use the instruments and the means employed by him in such a way as to ascertain the nature of the injury to *Mr. Kosak's* eye? *A.* Yes.

"(b) By failing to use the X-ray in ascertaining the nature of the injury to *Mr. Kosak's* eye? *A.* Yes.

"3. If you answer either subdivision of question 2 'Yes,' was the extent of *Mr. Kosak's* disability and the impairment of his eyesight increased as a natural and probable result of the failure of *Dr. Boyce* to exercise such reasonable care and skill? *A.* Yes.

"4. If you answer either subdivision of question 2 'Yes,' ought *Dr. Boyce,* acting as a physician and surgeon of ordinary intelligence and prudence, specializing in diseases of the eye, exercising such reasonable care and skill, reasonably to have foreseen that the extent of *Mr. Kosak's* disability and the impairment of his eyesight may probably be increased by his failure to exercise such reasonable care and skill? *A.* Yes.

"5. If you answer questions 1, 3, 4, and either subdivision of question 2 'Yes,' what sum will fairly and justly pay *Mr. Kosak* for the loss of time, the pain and suffering, and the impairment of eyesight which were caused by the failure of *Dr. Boyce* to exercise such reasonable care and skill, allowing nothing for the loss of time, pain and suffering, and impairment of eyesight which would have resulted from the injury to the eye sustained on November 23, 1920, if *Dr. Boyce* had exercised such reasonable care and skill? *A.* $2,000."

From a judgment entered on this verdict the defendant brings this appeal.

For the appellant there was a brief by *Richmond, Jackman, Wilkie & Toebaas* of Madison, and oral argument by *Harold M. Wilkie.*

For the respondent there was a brief by *Hall, Baker & Hall* of Madison, and oral argument by *John F. Baker* and *Frank W. Hall.*

Owen, J.    It will be noted that the jury found that the defendant failed to exercise such reasonable care and skill as was usually possessed and exercised by physicians and surgeons who specialized in the treatment of the eye, etc., (a) by failing to properly use the instruments and the means employed by him in such a way as to ascertain the nature of the injury to *Mr. Kosak's* eye; and (b) by failing to use the X-ray in ascertaining the nature of the injury to *Mr. Kosak's* eye.    Appellant maintains that there is no evidence to support these findings.    We shall not discuss whether the evidence supports the finding that the defendant failed to properly use the instruments and the means employed by him in such a way as to ascertain the nature of the injury to *Mr. Kosak's* eye further than to say that the fine particle of steel which was subsequently located and removed from the eye was evidently a very illusive object, as is evidenced by the fact that it required several examinations on the part of Dr. Davis to discover anything resembling a foreign substance in the eye and thereafter two or three X-ray plates to confirm what was formerly little more than a suspicion in the mind of Dr. Davis.    We should hesitate to say that under all the circumstances in the case a finding convicting *Dr. Boyce* of negligence in the use of the opthalmoscope was justified.

The evidence shows that the X-ray is sometimes necessarily employed for the purpose of locating foreign substances in the eye.    Although the X-ray is used in not to exceed four per cent. of the cases, according to the testimony in this case, it does indicate that the opthalmoscope cannot be infallibly relied on for that purpose, and the mere fact, standing alone, that *Dr. Boyce* failed to locate the foreign substance in the plaintiff's eye by the use of the opthalmoscope does not necessarily indicate that he was negligent in the use thereof, especially in view of the difficulty experienced by Dr. Davis in locating the foreign substance by the same means.    But we do think the evidence justifies

the finding that *Dr. Boyce* was negligent in failing to use the X-ray for the purpose of ascertaining whether a foreign substance was present in the eye.

According to the testimony the X-ray is employed as a sort of last resort, and its use is rather infrequent. It is used only in from two to four per cent. of the cases of eye injuries. The frequency of its use varies somewhat among the practitioners, and whether its use is necessary depends to no little extent upon the judgment of the practitioner. Whether it should be used depends upon the satisfaction which the opthalmoscopic examinations give to the examiner. The use of the X-ray is somewhat expensive, and the expense must be justified. Notwithstanding this, it was testified to by Dr. Abaly, an expert witness produced in behalf of the plaintiff, that under the circumstances of this case an X-ray picture of the eye should have been taken. Some criticism is made of Dr. Abaly's testimony by the appellant's attorneys because, due to the form of the question propounded to him, he was made to say that he would have caused an X-ray picture to be taken—the criticism being that this does not amount to testimony that the exercise of such reasonable care and skill as was usually possessed and exercised by physicians and surgeons who specialized in the treatment of the eye, and who were of good standing, and of the same school of practice, in the vicinity of Madison, having due regard to the advanced state of medical and surgical science, required the taking of an X-ray picture. However, we think that a consideration of Dr. Abaly's testimony as a whole indicates that such was the effect of his testimony. While Dr. Seaman and Dr. Briggs, produced as expert witnesses on behalf of the defendant, on direct examination testified that the exercise of reasonable care and skill did not require the taking of an X-ray picture of the eye, upon cross-examination they very much receded from this position. They conceded that far greater importance should have been attached to the repeated assertions of the plaintiff

that he believed there was something in his eye than was accorded by *Dr. Boyce*. *Dr. Boyce* testified that he did not attach very much importance to these declarations of the plaintiff because the scratch on the cornea was sufficient to cause a sensation which would lead the plaintiff to believe that there was something in his eye. Both Dr. Seaman and Dr. Briggs testified that these complaints on the part of the patient would raise in their minds some doubt as to the thoroughness of their opthalmoscopic examinations, which doubt they would resolve in favor of the patient, and might lead them to the conclusion that an X-ray examination should be made.

Then it also appears that *Dr. Boyce* was thoroughly satisfied from his examinations that the cornea had not been perforated, and as a foreign substance could not enter the lens or any other part of the eye without perforating the cornea he was quite convinced that there was nothing in the eye. His testimony is that the examinations he made would have revealed a perforation of the cornea if there had been one. On the other hand, Dr. Davis testified that it was sometimes impossible to discover a perforation of the cornea. If the latter be the case, it would seem to render a most thorough examination for the purpose of discovering whether a foreign substance is in the eye more imperative. We think that the testimony of all the experts might well have left the impression with the jury that the exercise of ordinary care and skill under the circumstances of this case did require the use of the X-ray to ascertain the nature of the injury to plaintiff's eye. We feel that the answer of the jury in this respect must stand.

But we cannot sustain the finding of the jury that the extent of *Mr. Kosak's* disability and the impairment of his eyesight was increased as a natural and probable result of the failure of *Dr. Boyce* to exercise such reasonable care and skill. The testimony of defendant's expert witnesses is to

the effect that even though the particle of steel had been discovered in the plaintiff's eye upon the occasion of his first visit to *Dr. Boyce's* office, and the same had been removed as soon as it might have been thereafter, plaintiff's eye would in all probability have been in the same condition. Their testimony is that when a magnet operation is performed to remove a foreign substance from the eye, a cataract usually and naturally results which necessitates a removal of the lens, just as was done in this case. Dr. Davis testified that there would have been no difference in the disability sustained by the plaintiff had the fine particle of steel been removed soon after the injury, because, as he stated, he got a perfect result from his operation. In other words, the testimony of these experts is to the effect that the damage to the eye occurred when the foreign substance entered the eye and not when it was removed; that whenever it is removed by a magnet operation, whether early or late, a cataract will follow which will necessitate the removal of the lens. Dr. Abaly testified that if the particle of steel had been withdrawn from the eye probably within a week after it entered, there would be a good chance for recovery, and by recovery he meant *more or less useful vision,* and that if it had been so withdrawn and a cataract did not form, as compared with its present condition "it would have been much better, I think." If there is any testimony in the record upon which the jury's award of $2,000 damages can be based it is this testimony, and this testimony, when considered in connection with all the other testimony in the case, is wholly insufficient to enable the jury to fix the amount of damages which plaintiff sustained by reason of the failure of *Dr. Boyce* to discover and remove the piece of steel while the plaintiff was under his care and treatment. The term "more or less useful vision" and the opinion "it would have been much better, I think," form no basis upon which the extent of damage sustained may be computed in terms of

dollars and cents.   We conclude that there is no basis in the record for the assessment of any damages for the impairment of the eyesight.

There is, however, another element of damages for which there is support in the evidence.   According to the plaintiff's testimony he suffered much pain until the piece of steel was removed on the 8th day of April.   It is apparent that he would have been spared this pain had the removal taken place at an earlier date.   We see no reason why this element of damages is not the proximate result of the defendant's negligence, for the amount of which the plaintiff is entitled to judgment.   It is desirable to avoid a retrial of this action, if possible.   To that end we have decided to give the defendant, upon the return of the record to the lower court, the option of submitting to a judgment in favor of plaintiff for $500 or a new trial.   We believe that this is the most that a jury would award for the pain and suffering sustained by the plaintiff as the proximate result of the defendant's negligence.   The evidence that he did sustain pain and suffering is confined to his own testimony, as both *Dr. Boyce* and Dr. Davis testified that he did not complain of any pain, and it further appears that he continued at work until the removal of the piece of steel on April 8th.   As this is an element of damages not compensable under the workmen's compensation act, no deductions from said $500 should be made under the provisions of sub. (3), sec. 2394—25, Stats., for any amount paid to the plaintiff by his employer under the provisions of the workmen's compensation act.

This disposition of the case makes it unnecessary to discuss the alleged errors of procedure urged as grounds for reversal by the appellant.   We shall, however, take this occasion to discuss one or two for the future guidance of trial courts and the bar.

The appellant makes complaint concerning the form of the verdict.   It will be noted that the second question of the special verdict submits to the jury two elements of negli-

gence, designated (a) and (b). The verdict finds the defendant guilty of negligence in both respects. Question 3 inquires generally as to whether the extent of plaintiff's disability and impairment of eyesight was increased as a natural and probable result of the failure of defendant to exercise such reasonable care and skill. As we have seen, there is no evidence to sustain the finding of negligence on the part of the defendant in his failure to properly use the instruments and means employed by him in such a way as to ascertain the nature of the injury to *Mr. Kosak's* eye. This leaves the failure of the defendant to use the X-ray as the only ground of negligence. The answer to question 3 does not tell us whether ten members of the jury believed the failure of the defendant to use the X-ray increased the extent of plaintiff's disability and the impairment of his eyesight. A portion of the jury might have felt that one ground of negligence so contributed, while others might have considered that the other ground of negligence was responsible for the increased disability. Under the form of the question, a juror was warranted in answering question 3 "Yes" if he believed that either ground of negligence contributed to an increased disability or impairment of the eyesight. In other words, the verdict does not indicate whether a requisite number of the jury believed that the extent of disability and impairment of eyesight was increased as a natural and probable result of the failure of *Dr. Boyce* to use the X-ray. Correct practice required that question 3 be divided so as to make independent inquiry concerning the effect of each ground of negligence submitted in question 2.

The appellant further complains that in view of the fact that three questions of the special verdict are answered by less than a unanimous vote of the jury, it cannot be ascertained from an inspection of such answers whether the same ten jurors agreed on all of them. This is urged as reversal. This matter was considered in *Dick v. Heisler*, 184 Wis. 77, 198 N. W. 734, and it was there held that it

was necessary for the same ten jurors to agree upon answers to every question of the special verdict. It was there suggested that this might be made to appear by requiring the dissenting members of the jury to be indicated wherever the answers were not unanimous. We have before us a verdict where it is possible that five members of the jury disagreed with some feature thereof, and we have no way of telling whether ten agreed on the answer to every question. We take this occasion to say, however, that appellant is in no position to urge this as reversible error. He had it within his power to make this uncertain verdict definite and certain by polling the jury. We will not tolerate a practice which will permit a party to remain silent upon the coming in of the jury's verdict and thereafter urge the uncertainty of that verdict as ground for a new trial or a reversal, when he had it within his power then and there, by demanding a poll of the jury, to establish whether the verdict was lawful. He who fails to challenge the regularity of a verdict in this respect when it is returned into court will be held to have waived such irregularity and will not thereafter be permitted to take advantage of it.

*By the Court.*—The judgment is reversed, and the cause remanded with instructions to grant a new trial, unless within thirty days after the filing of the record in the circuit court the defendant serves notice upon the plaintiff's attorneys and files the same with the clerk of the court that he elects to permit judgment to be rendered against him in the sum of five hundred ($500) dollars.