## WEINTRAUB et al. v. ROSEN et al.

### No. 6189.

Circuit Court of Appeals, Seventh Circuit.

Dec. 13, 1937.

Rehearing Denied Jan. 13, 1938.

William St. John Wines, of Springfield, Ill., Myer M. Rich, of Kansas City, Mo., for appellants.

William L. Patton and A. M. Fitzgerald, both of Springfield, Ill., for appellees.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

By this action appellants sought to recover damages from appellees, who are practicing physicians, which it is alleged resulted from malpractice. The case was tried before a jury and at the conclusion of appellants' evidence the court sustained appellees' motion for a directed verdict, and rendered judgment for costs against appellants, from which judgment this appeal is prosecuted.

The damages involved resulted from injuries to Mrs. Weintraub by reason of an automobile accident which occurred near Springfield, Illinois, on August 9, 1933. At the time of the accident she was accompanied by her husband, who is her co-appellant, together with her brother and her son. They are all residents of Kansas City. She was immediately taken to a hospital in Springfield where it was found that she had suffered very serious injuries. Appellees who were called to attend her found that she had sustained a skull fracture extending from the frontal bone almost to the base of the skull, and she was unconscious for several days. She was then about forty-seven years of age and weighed about one hundred and four pounds. The injury to her head was of such a serious nature that her life was despaired of for several days. After four or five days she regained consciousness, and was able to take nourishment, and to perform the bodily functions of excretion. At the expiration of about three weeks she was placed in a wheel chair for short periods of time, and on September 7, she was returned to her home in Kansas City by ambulance and by train. This was accomplished by the advice and consent of appellees who then informed her husband that she was out of danger although they ordered that she be accompanied by a nurse, which was done. During the time she was in the Springfield hospital she gave many indications that she was suffering pain in her right hip. Appellees thereupon tested the sole of her right foot for sensation, and stated that the injury had probably caused a partial paralysis. Later they requested the patient to move her toe, which she did. They at no time examined the hip and at the time the patient left Springfield they had no knowledge that the hip was fractured.

When she arrived at her home she was visited and examined by her family physician who said that she was conscious and partly rational at times. On the third day he observed that her right leg was shorter than the left, and at his direction she was taken to a hospital for an X-ray examination of her hip. Upon consultation with other medical counsel it was decided to put an extension on the leg. This caused considerable pain, and it was removed in a day or two. The family physician who continued to treat her said that she was nervous and physically incapacitated in every way imaginable.

It is unnecessary to recite the evidence of the attending physicians at Kansas City. It may be said from their testimony, however, that an examination of the hip, if made while the patient was at Springfield, would have disclosed the fracture, and that her right leg was perceptibly shorter at the time she left the Springfield hospital.

The undisputed evidence disclosed that in fractures of this nature if the fracture is not reduced within two or three weeks from the injury a fibrous tissue begins to cover the ends of the broken bone, which renders it practically impossible to secure a bony union thereafter.

In April, 1934, Dr. Dickson, an orthopedic surgeon, was first called to see her. At that time the X-ray showed a fracture of the neck of the femur, but not an impacted one. Dr. Dickson said she was so excitable that it was very difficult to make a complete examination, but that she had some shortening, limitation of motion, and pain in the right hip. He saw the X-ray which had been taken at the Kansas City hospital and which showed a fibrous union. On May 16, 1934; the hip was put in an abduction case to see if the fibrous union could be converted into a bony one. The case was allowed to remain until June 22, when she was put on crutches and exercises. She seemed to progress fairly satisfactorily, and on October 10, 1934, he took an X-ray of her hip which looked very encouraging. In March, 1935, her symptoms became definitely worse, and he recommended a Whitman reconstruction operation which he performed on May 29, 1935. The operation was quite successful, but the shortage in her limb was permanent.

It is not denied that appellant suffered a very serious injury, both to her head and to her hip, and we need not discuss that subject. It is conceded that the injury to the patient's head was the more serious of the two, and caused her to linger between life and death for several days.

The first question for our consideration is whether the court erred in directing a verdict for the appellees. We agree with the latter's contentions: (1) That the burden was upon appellants to establish a prima facie case of negligence on the part of appellees; and (2) that one or more of the alleged injuries proximately resulted from that negligence.

■ The court directed the verdict on the theory that the first duty of the physicians was to save the patient's life, if possible, and that even though the appellees might have been guilty of negligence in not discovering the condition of the hip, yet they would not be held for damages unless the evidence showed that they could have safely examined and cared for her injured hip without endangering her life while she was undergoing treatment for the serious condition of her head.

We cannot agree entirely with this theory. We think the correct statement under such conditions would be that appellees could not be held for the resulting damages, if any, if the evidence disclosed that they could not have safely examined and cared for her injured hip without endangering her life. The error in the adopted theory lies in the fact that the court placed the burden upon appellants, in the first instance, of proving that the patient was in a fit condition to have her hip examined and cared for without endangering her life. This, we think, placed upon appellants a greater burden than the law warrants. In Davis v. Kerr, 239 Pa. 351, 86 A. 1007, 46 L.R.A., N.S., 611, it was held that the burden of showing care was upon a surgeon who left a sponge enclosed in a wound. To meet that burden was his defense, and in the absence of supporting evidence the plaintiff's prima facie case, if made, would not be defeated. So in the case at bar, conceding that a prima facie case of negligence had been established, the burden was upon appellees, if they desired to avail themselves of that defense, to prove that the patient's condition was such that examination or treatment of her hip would have endangered her life. That defense, if established, would have been complete, even if established by appellants' evidence. It can not be contended, however, except by unwarranted inferences, that such defense was established, and the case was disposed of because appellants had not disproved the negative of a defense which had not been established.

■ Aside from the injury to the patient's head there can be no doubt that appellants established a prima facie case of negligence, with proximately resulting damages. It may be conceded that the injury to her head prevented an examination and treatment of her hip sooner than five days after the injury, for she was unconscious during that time. However, this record discloses that the patient was in a condition to undergo an examination of her hip when she regained consciousness, as shown by the fol-

lowing question and the answer thereto by Dr. Davis:

"Assuming that this woman entered St. John's Hospital in Springfield, Illinois, on August 9, 1933, in the state of shock, unconscious, and remained so for some four or five days and then recovered consciousness and gradually improved, in your opinion would the shortening of her leg· have been apparent before her discharge from the hospital, on September 6th, 1933?

"A. Yes, if the shortening I saw was there it would have been in evidence. Upon regaining consciousness it would have become apparent in all probability. Assuming that the patient had sustained other injuries including a serious skull fracture, and she was completely unconscious and in shock and had a history of an automobile accident, in my opinion that fractured femur could have been discovered by a physician of ordinary skill and ability after a thorough examination of the patient had been made, whenever she was in condition to undergo examination. I would say that would be after she regained consciousness. If a thorough examination had been made by reasonably skillful and competent attending physicians I think the examination would have disclosed the fracture.

"Assuming that the patient entered the hospital unconscious in shock suffering from a serious skull fracture, and while she was unconscious for several days she unconsciously rubbed her hip and groaned and when she recovered consciousness she continued to rub her hip and groan, in my opinion I would rather think it would direct the attention of a reasonably skillful and competent physician to the hip. Under those circumstances I would think that an examination of that part of the body would be required." .

█ We may safely assume from the evidence, therefore, that appellees were negligent in not observing the condition of the patient's hip. They owed her the duty of making such examination and giving her such treatment as her physical condition and the skill of their profession in that community warranted. They did nothing so far as the injury to her hip was concerned either in the way of curative or palliative measures. This fact speaks loudly in support of appellants' contention that they made no examination and had no knowledge of the fracture. To conclude otherwise would be unjust to appellees.

██ Appellees urge, however, that there was no evidence to show what the skill of the profession was in the neighborhood of Springfield. Hence, they insist that they have not been shown to have violated any duty which they owed the patient. They refer to Springfield as a country town. The court takes knowledge of the fact that it has a population of nearly seventy thousand; that it is the capital of one of the greatest states of the Union, with respect to population, natural resources, general education and development, and is surrounded by medical colleges which rank very high. Under these circumstances we think the neighborhood of Springfield or any other city similarly situated, should not be too narrowly limited.

Assignments of error have been made with respect to the rejection of evidence of medical witnesses outside of the city of Springfield. It is not necessary to pass on these questions specifically. Indeed such matters are to a great extent within the discretion of the trial court. The answers stricken do not appear to us to be highly important, and the alleged errors may not arise again.

Aside from the medical skill in that particular locality, it is fairly inferable from this record that where there is a fracture of the femur, which is not impacted, there should be an apposition of the broken ends of the bone as soon as possible, if by so doing the patient's life is not endangered. True, the evidence discloses that in cases of impacted fractures, this is not always necessary or advisable, but this was not an impacted fracture. In some cases where the fracture was not impacted Dr. Dickson stated that he did nothing, and the patient died within a short time. It was evident in such cases that he was rightfully attempting to save human life, and he further limited his statement by saying that the patients were sixty years of age or over.

It is unbelievable that the medical skill of the Springfield physicians is not sufficient to enable them to discover and reduce a fracture. The record discloses that the use of a gutter splint would have relieved the patient of some pain and would have kept the bones a little nearer together where some one might have a chance to do something with them later.

██ That injury proximately resulted to appellant from appellees' negligence we

think there can be no doubt under the evidence. What those injuries were we can not define with accuracy. This is largely true in all such cases. Even had there been no negligence there is no assurance that the patient's hip would have been in any better condition than it is now. These are matters which are not subject to exact proof, and yet they are matters for the jury's determination. Aside from this, however, there was evidence of pain and suffering of the patient, caused by failure to discover and reduce the fracture; and there was expense and loss of services resulting to her husband from the same cause. These are likewise difficult of accurate determination, but they are none the less to be determined by the jury under proper instructions of the court.

Appellants further contend that the court erred in sustaining appellees' objection to a question put to the patient's brother relative to statements of Dr. Barker outside of the presence of the other appellees, and in striking his answer to that question. These statements amounted to an admission of lack of knowledge of the fracture. The question and answer were proper as affecting Dr. Barker and should not have been stricken. While the answer was not binding on the other appellants, yet they could have been protected in this respect by a proper instruction if and when the case went to the jury.

The judgment of the District Court is reversed, and the cause remanded with instructions to grant a new trial.