Jean **BRYANT**, Appellant,

v.

John **RANKIN**, William Harper, Appellees.

Jean **BRYANT**, Appellee,

v.

John **RANKIN**, Appellant.

Nos. 71–1534, 71–1549.

United States Court of Appeals, Eighth Circuit.

Submitted May 9, 1972.

Decided Oct. 19, 1972.

William Bauer, Burlington, Iowa, for Jean Bryant.

Robert V. P. Waterman, Lane & Waterman, Davenport, Iowa, for John Rankin, appellee and appellant.

D. B. Hendrickson, Walker, Concannon & Hendrickson, Robert H. Walker, Keokuk, Iowa, for appellee, William Harper.

Before LAY, BRIGHT and ROSS, Circuit Judges.

ROSS, Circuit Judge.

This is a malpractice action brought by the plaintiff, Jean Bryant, against Dr. John Rankin, a surgeon, and Dr. William Harper, a general practitioner. The complaint alleged that negligent diagnosis and treatment of a hip fracture sustained by the plaintiff in an automobile accident, resulted in her permanent disability. The case was tried to a jury which returned a verdict in favor of Mrs. Bryant in the sum of $150,000.00. However, the trial court granted motions filed by both defendants for judgment notwithstanding the verdict and, in the alternative, for a new trial, 332 F. Supp. 319 (S.D.Iowa 1971). We affirm the judgment n. o. v.

Mrs. Bryant was involved in the automobile accident on September 10, 1965, sustaining, among other injuries, a fracture of her left hip. She first was seen by Dr. Harper at St. Joseph's hospital in Keokuk, Iowa about three hours after

the accident. Dr. Harper examined her and gave instructions to take x-rays which were then taken by the hospital radiologist. These x-rays indicated an impacted fracture of the left femoral neck. Dr. Harper consulted Dr. Rankin, a general surgeon with whom he often worked; and on September 15, 1965, Dr. Rankin performed an operation which involved an open reduction and insertion of a Smith-Peterson nail. X-rays indicated good alignment and that the fracture had been properly reduced.

X-rays were taken thereafter at about two-week intervals. On October 26, 1965, the defendants, in consultation with the radiologist, noted some detachment or deterioration of the head of the femur. On November 17, 1965, the x-rays showed some further deterioration of this bone. Dr. Harper testified that the radiologist (who was not available to testify at the trial) indicated that there was some evidence of aseptic necrosis,[1] but "he felt that the thing that we should do is to wait and watch and see, because he felt that if aseptic necrosis were present, even though at this time he could not definitely diagnose it, it would not hurt anything to wait." At that time, Mrs. Bryant was complaining about pain and Dr. Harper discussed this with Dr. Rankin and the radiologist. The radiologist stated that "[h]e saw no evidence of any infection of the joint. And he felt that we should wait, and in approximately a month to six weeks repeat the x-rays and see; and that if he were right about the aseptic necrosis, it certainly wasn't going to hurt to wait this length of time."

On January 3, 1966, x-rays disclosed "a little flattening of the head of the femur which is expected in avascular necrosis," and all three doctors agreed on the diagnosis of avascular necrosis at that time. Mrs. Bryant was then advised that eventually this was going to require a further surgical procedure.

Mrs. Bryant indicated a desire to be transferred to the Columbia Medical Center at the University of Missouri and the transfer application was made. X-rays were again taken on January 13, 1966, and February 10, 1966, which, according to Dr. Rankin, showed no marked change except some further "destruction of the head in the superior or upper part of the hip bone." Mrs. Bryant was admitted to the Columbia Medical Center on March 8, 1966.

Shortly after her admission to the Columbia Medical Center, x-rays were taken and Dr. Thomas Culley, an orthopedic surgeon, testified that the staff discussed possible diagnoses and thought that it could be an infection in the hip joint or "that it might be an avascular necrosis of the head of the femur, which is a reasonably common place complication of a fracture." The Smith-Peterson nail was removed, and a biopsy and culture of the hip were performed which showed that Mrs. Bryant did in fact have a chronic, low-grade infection of a type rarely found in hip joints. She was then placed in a spica cast in hope that there would be a voluntary fusion of the hip joint. This cast was left on (although changed twice) until October, 1966, when the hope for a voluntary fusion was discarded and a bone graft was performed. This was also unsuccessful; and in March of 1967, a further operation was performed which was a resection of the femoral head, also referred to as a Girdle Stone Procedure. This amounted to the removal of the ball portion of the hip joint which allows the hip to ride out of the socket and results in a shortening of the leg. In June of 1969, further surgery was performed to correct a condition of her left foot resulting from the lengthy time her foot was in the cast. Plaintiff now has a permanent disability of her left leg and hip which leaves her left leg functionally disabled from 50% to 60% of normal.

1. Aseptic necrosis, in this case, refers to dead bone resulting from loss of blood supply. Apparently avascular necrosis is used interchangeably with aseptic necrosis. Septic necrosis refers to dead bone caused by infection.

■ The essence of Mrs. Bryant's cause of action against these two doctors is that they were negligent in failing to diagnose the low-grade infection, which she claims the jury could find was present in her hip in October and November of 1965 when the x-rays started to show some deterioration of the head of the femur. There is no question but what under the applicable Iowa law the failure to exercise skill, care, and attention in making a diagnosis may result in a determination of negligence on the part of a doctor.

"Malpractice may consist in lack of skill or care in diagnosis as well as in treatment. A patient is entitled to a thorough and careful examination such as his condition and attending circumstances will permit, with such diligence and methods of diagnosis as are usually approved and practiced by physicians of the same school of medicine, of ordinary learning, judgment and skill, under like circumstances and in like localities." Wheatley v. Heideman, 251 Iowa 695, 102 N.W.2d 343, 349 (1960).

■■ On the other hand, an error in diagnosis "will not support a verdict for damages unless there is evidence of lack of skill or care in making the examination or forming the doctor's judgment."

Wilson v. Corbin, 241 Iowa 593, 41 N.W.2d 702, 706 (1950). Evidence of the required skill and care, which must be exercised by a physician, must be given by an expert witness unless the physician's lack of care is so obvious as to be within the comprehension of the layman's common knowledge or experience, or the physician injures a part of the body not under treatment.[2] Sinkey v. Surgical Associates, 186 N.W.2d 658, 660 (Iowa 1971); Grosjean v. Spencer, 258 Iowa 685, 140 N.W.2d 139, 143–144 (1966).

In the trial of this case, plaintiff offered no testimony as to what the standard of care under similar circumstances would be;[3] no expert testimony that the defendants Rankin and Harper violated any standard of care or that they were negligent in failing to make an alternative diagnosis of infection; and no expert testimony that the delay in making this diagnosis of infection contributed in any specific way to the ultimate disability of the plaintiff.

■ It is true that Dr. Rankin testified that if he had "felt there was an infection in the hip joint" he would have attempted to aspirate the hip joint to try to determine whether or not infection was present.[4] He also testified that ·

2. See e. g., Wheatley v. Heideman, 251 Iowa 695, 102 N.W.2d 343 (1960) (osteopath failed to observe cut eye in treating lacerated eyelid); Stickleman v. Synhorst, 243 Iowa 872, 52 N.W.2d 504 (1952) (doctor admitted that he made a mistake by missing trachea and puncturing throat with a hypodermic needle); Wilson v. Corbin, 241 Iowa 593, 41 N.W.2d 702 (1950) (although plaintiff fell twelve to fourteen feet and landed in a sitting position, only his pelvis and fourth and fifth lumbar vertebrae were x-rayed, and thus the compression fracture to the third lumbar vertebra was not diagnosed); Whetstine v. Moravec, 228 Iowa 352, 291 N.W. 425 (1940) (res ipsa loquitur was applied where dentist caused the root of a tooth to pass into plaintiff's lung); Kopecky v. Hasek Bros., 180 Iowa 45, 162 N.W. 828 (1917) (dentist punctured root of tooth in drilling, yet filled tooth regardless).

3. Dr. Schnell, an expert witness for the plaintiff, testified that he was familiar with the general standard of care practiced by physicians and surgeons in towns the size of Keokuk, Iowa, and throughout the State of Iowa, but was not asked to define that standard of care.

4. Dr. Litton of the Columbia Medical Center testified that it would have been more difficult to successfully aspirate in this case because Mrs. Bryant was a large person; that he was not positive such a procedure would have produced a culture; that where there are "clinical findings of no temperature elevation, no abnormal white blood count, no evidence of infection around the incision, no toxicity, and no tenderness by that site," "[i]t would make the possibility of infection very small. . . ."; that in cases involving fractures of the femoral neck about 30% of them develop avascular necrosis; and that it was possible to have pain

none of the classical or clinical signs of infection were present. Dr. Rankin chose to rely on clinical findings such as white blood corpuscle counts [5] and lack of toxicity, swelling, or redness, lack of temperature elevation, together with the advice of his radiologist and his own experience of over thirty years, in making his diagnosis of an aseptic necrosis.[6] If this was negligence, it most certainly did not amount to negligence "so obvious as to be within the comprehension of the layman's common knowledge or experience." Sinkey v. Surgical Associates, supra, 186 N.W.2d at 660. This is not a case of obvious lack of care comparable to dropping a part of a tooth into a patient's lung; or failing to x-ray the proper portion of a patient's lumbar vertebra; or puncturing a patient's neck instead of her trachea.[7] If the plaintiff in this case was to make a submissible issue for the jury, it was incumbent upon her to establish that the failure of the defendants to make the diagnosis of infection, was negligent and a breach of the standard of care to be expected of surgeons and physicians under similar circumstances. She failed to produce any expert testimony that the attending physicians failed to use reasonable care and, as we have already noted, the conduct of these physicians was not so obviously negligent as to be within the comprehension of the layman's common knowledge or experience. Her failure to offer such testimony justified the trial court in granting judgment n. o. v.

However, even assuming that Mrs. Bryant made an adequate showing of negligence to permit the trial court to submit the case to the jury, she completely failed to establish that her disability resulted from the failure of Dr. Rankin or Dr. Harper to correctly diagnose her condition and treat her for the infection. There was no evidence offered by the plaintiff to the effect that the disability would have been avoided or reduced by earlier diagnosis and treatment of the infection, although Dr. Litton did testify generally that "the sooner you find an infection, the better the chance there is of obtaining a good result." This opinion was also expressed by Dr. Schnell.

Dr. Litton, the orthopedic surgeon at the Columbia Medical Center, testified that if the operation which was performed in March of 1966 had been performed as early as December of 1965, he doubted that the result would be any different.

Dr. Schnell, Mrs. Bryant's expert witness, acknowledged that he could not say that the infection "was causally related to the destruction of the head of the femur and the neck of the femur." He testified that he suspected that there was a possibility that this was "one of the causal factors of the change in the joint space and the femoral head as we see it in the x-ray." He also testified that perhaps Dr. Rankin and Dr. Harper felt "this was a low grade infection, which, without systemic signs of infection: wound change, lack of change of white cell count, erythrocyte sedimentation rate, et cetera, that the body was controlling this infection, having limited

associated with an avascular necrosis condition. Dr. Schnell also stated that pain could be present with an aseptic necrosis, but that it would be greater with a septic necrosis.

5. As late as January 12, 1966, the plaintiff had a normal white blood corpuscle count of 9300.

6. Dr. Culley, who treated plaintiff at the Columbia Medical Center, testified that there was nothing to indicate that the treatment of the plaintiff by Dr. Harper and Dr. Rankin "was not adequate or medically proper in any way."

7. In Sinkey v. Surgical Associates, supra, 186 N.W.2d at 661, the Iowa Supreme Court made this observation in a case involving the interpretation of x-rays:
   "We cannot agree with appellant's contention that this is an appropriate case to apply this exception to the general rule requiring proof by expert testimony. The cases where we have indicated the exception might apply have all been cases where something drastic was wrong with the diagnosis or the treatment."

it to the hip or femoral head, or both. Therefore, they would have expected the body to continue to control and eradicate the infection, without the use of antibiotics. I don't know this, but this is suspect." Dr. Schnell was then asked this question: "Doctor, do you have an opinion, based upon reasonable medical certainty, and based upon your qualifications and experience, and your review of those documents presented to you by plaintiff's attorneys, whether the condition of Mrs. Jean Bryant would be any different today if in fact she had the hardware removed in January of 1966 and then she was placed in a spica cast in an attempt to—in an attempted voluntary fusion?" Dr. Schnell responded: "No, I think the end result could have been the same." Later he acknowledged that his answer would probably be the same if similar treatment had been instituted in December of 1965.

■ In Iowa, the issue of proximate cause is ordinarily for the jury where there is substantial evidence of a defendant's negligence. Wilson v. Corbin, *supra*, 41 N.W.2d at 708. But the evidence adduced by the plaintiff must show that "plaintiff's theory is reasonably probable, not merely possible, and more probable than any other theory based thereon. It is not necessary that the proof be conclusive or exclude every other suggested or possible cause." Stickleman v. Synhorst, *supra*, 52 N.W. at 507.

In this case, the evidence may have shown that it was *possible* that the failure to diagnose and treat the infection contributed to the disability of Mrs. Bryant, but it certainly could not be interpreted as having shown that it was *reasonably probable* or "more probable than any other theory" to have been the cause of Mrs. Bryant's condition.

■ In Barnes v. Bovenmeyer, 255 Iowa 220, 122 N.W.2d 312, 316–317 (1963), the Iowa Supreme Court made it clear that proof of negligence alone does not entitle a plaintiff to go to a jury in a malpractice case. "There must also be substantial evidence that it was the proximate cause of plaintiff's damage." *See also* Ramberg v. Morgan, 209 Iowa 474, 218 N.W. 492, 498–499 (1928).

We conclude that Mrs. Bryant failed to produce substantial evidence that the alleged negligence was the proximate cause of her damage and the judgment n. o. v. was properly granted for that additional reason.

Judgment affirmed.

LAY, Circuit Judge (dissenting).

I respectfully dissent from the affirmance of the judgment n. o. v.

Although judges properly serve as an ultimate safeguard to prevent a miscarriage of justice and as such possess the legal authority to take away a jury's finding of fact, nevertheless, the exercise of that power should be used only in exceptional circumstances. Unfortunately, this power is often exercised merely because judges sometimes feel that other results under the evidence are more reasonable than what the jury found. When this occurs we act without judicial authority. Tennant v. Peoria & Pekin Union Ry., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944). Judges possess no expertise in evaluating facts or drawing inferences from the evidence. When as judges we act as fact finders we draw from our human experiences and biases just as jurors do. Yet when judges attempt to decide questions of reasonable care and causal connection, we more often fall short of the valued expertise of the jury. In resolving factual issues judges cannot possess the community values and judgment of a composite jury in attempting to equate conduct in terms of the common affairs of life. See Railroad Co. v. Stout, 84 U.S. 657, 664, 21 L.Ed. 745 (1873). When a judge holds that a jury's verdict is wrong on a factual basis, he substitutes his reasonableness for that of twelve individuals who have resolved their subjective reasoning into an objective analysis and result.

When this occurs the record should be so void of any substantial evidence that a court can objectively say that no reasonable man could ever differ in the result reached. It is impossible to say this on the present record.

The majority decision emphasizes that there is no expert opinion evidence to prove negligence or causal connection in this medical malpractice case. It is true that in medical malpractice cases it is held that the standard of care of a skilled physician is not within the general knowledge of a lay jury and under these circumstances expert *testimony* is generally needed. However, this rule is not to be interpreted so strictly as to require that the expert testimony should always be in the standard form which necessarily elicits an *opinion* as to the negligence and causation. Jurors apply common sense to all factual circumstances in arriving at a fair verdict. This is really their only tool. Trial lawyers seek opinion evidence to corroborate their evidence, seldom to prove the case itself. Indeed, *opinion* evidence offered by expert witnesses is nothing more than a swearing match by professional witnesses. In this day and age, even in malpractice cases, it is not overly difficult to hire expert opinion evidence on either side of a medical proposition. The law is not so stilted as to depend on such evanescent testimony. Significantly, our jurisprudence leaves it to the nonexperts, the jury, to determine which side of the case is more reasonable and just. In Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959), where the question of trauma as an aggravating cause of a tubercular condition was at issue, the Supreme Court cogently observed in the language of an Indiana case:[1] " 'Indeed, if it were not for the saving grace of what we call common sense, justice would be defeated in almost every case where opinion evidence is admitted.' " 361 U.S. at 110 n. 3, 80 S.Ct. at 175.

Common sense dictated the jury's verdict here. Although the standard form questions were not asked by plaintiff's counsel and precise opinion evidence is absent from the record, nevertheless, there exists an abundance of *expert* testimony which adequately demonstrates the lack of reasonable care by the defendant doctors in making their examination and resulting diagnosis of Mrs. Bryant.

It is true that a mere mistake in judgment is not a basis of liability in a medical negligence case. However, to avail himself of the defense of a mistake of judgment, as has been observed, "it must appear that the physician used reasonable care in exercising that judgment. . . ." Foose v. Haymond, 135 Colo. 275, 310 P.2d 722, 727 (1957). Iowa law is in full accord. Iowa law recognizes that a physician skilled in his professional calling must make a thorough and professional examination or liability for negligent diagnosis may follow. See Wheatley v. Heideman, 251 Iowa 695, 102 N.W.2d 343, 349 (1960). Application of this rule governs the proof of negligence in this case.

The fundamental issue is whether Dr. Rankin, *a skilled practicing surgeon,* was aware of and knew there was the *possibility* of low grade infection existing (even though it be unusual) which would not manifest itself by the usual clinical findings of redness, temperature and a high white blood count. There can be little doubt of this evidence since Dr. Rankin admitted in his own expert testimony his awareness of such a possibility. Once this fact was established and recognizing that a doctor must make a thorough examination, is it unreasonable to inquire as to whether the doctor did *anything* to rule out this possibility before he made his diagnosis of aseptic necrosis and elected to "wait and see?" The plain and simple fact is that Dr. Rankin admitted he did *nothing* to rule

1. Miami Coal Co. v. Luce, 76 Ind.App. 245, 131 N.E. 824, 826 (1921).

out that possibility.[2] Was there a diagnostic technique available to him which was followed in that locality to ascertain whether a low grade infection existed? Again by his *own expert testimony* he stated "had he suspected a low grade infection he would have aspirated the hip" in order to obtain a culture for study.[3] Is a skilled surgeon to be excused because he did not *suspect* this infection since he relied on the absence of clinical symptoms which one doctor characterized as "Reader's Digest and Good Housekeeping" signs of infection? At best is not this an issue of fact for the jury? Is this not especially true when the same physician admitted that low grade infection could exist without these symptoms?

Assume the owner of a truck took his vehicle to the garage to have its brakes fixed since they would not hold; assume that all the *skilled* mechanic did was to check and replace the brake fluid; assume the vehicle was returned and shortly thereafter the truck was involved in a serious accident because the brakes failed to hold when attempting to

stop; and assume an inspection then revealed that the brakes were otherwise completley worn out and defective. Would there be any doubt that in the absence of an expert's opinion the *skilled* garage mechanic would be held to have been negligent in failing to check out other possible causes for the brake condition? Cf. M. Dietz & Sons, Inc. v. Miller, 43 N.J.Super. 334, 128 A.2d 719 (1957). How is the skilled physician any different or immune from this same standard of care? The ordinary layman is no more a skilled mechanic than a skilled physician. Yet, it does not require an expert opinion to prove that reasonable care was not used in making a thorough inspection of the truck. There is greater reason that the same rule should apply to an examination of the human body. Is it not axiomatic in negligence cases that the standard of care required is commensurate to the risk involved? Foy v. Friedman, 108 U.S.App.D.C. 176, 280 F.2d 724 (D.C.Cir. 1960); Prosser, Law of Torts, § 34 (3d ed. 1964); Restatement (Second) of Torts, § 298 (1965).[4]

2. The majority alludes to the fact that Dr. Rankin relied on the radiologist's opinion that the X-rays did not demonstrate evidence of infection. This fact has little relevance in determining whether the plaintiff made a prima facie case. Perhaps the jury disbelieved this statement. It is controverted by plaintiff's evidence that the early X-rays demonstrated a rapid deterioration of the soft tissue—a product of some kind of necrosis. Dr. Rankin even admitted this. Nevertheless, Dr. Rankin, as a skilled surgeon holding himself out as having the skill of an orthopedic specialist, was in charge of the case. He can hardly delegate his responsibility to make a thorough investigation because a radiologist misreads an X-ray. He knew there was necrosis and it was his duty to make a thorough examination to · determine why.

3. The mere fact that a diagnostic technique *might not* disclose the infection is hardly a defense. However, again this is not relevant here. Dr. Rankin did not suggest this as a reason for not aspirating the hip joint. The other side of this reasoning is that it is a medical technique

which *might have* disclosed it. It must be remembered that the verdict holder is entitled to the most favorable inference from the evidence. O'Brian v. Stover, 443 F.2d 1013, 1014 (8 Cir. 1971); Kotula v. Ford Motor Co., 338 F.2d 732, 735 (8 Cir. 1964), cert. denied, 380 U.S. 979, 85 S.Ct. 1333, 14 L.Ed.2d 273 (1965); Dobson v. Jewell, 189 N.W.2d 547, 550 (Iowa 1971); Marxen v. Meredith, 246 Iowa 1173, 69 N.W.2d 399, 401 (1955).

4. "*Even where the special medical standards is invoked as the touchstone of liability, 'the proposition that experts alone are qualified to testify as to the manner of treatment of a patient is "sound only when soundly applied,"*'" and ' "there must be, in the nature of things, many instances where the facts alone prove the negligence, and where it is unnecessary to have the opinions of persons skillful in the particular science to show unskillful and negligent treatment." ' And we have differentiated situations 'where the question turns on the merits and the performance of scientific treatment,' so that 'the issue may not be resolved by the jury without the aid of expert opin-

In addition to the defendants' own admissions,[5] which uniformly have been held sufficient to provide the required expert testimony,[6] there existed other overall evidence for the jury to consider.

Expert testimony was adduced for the jury to consider that insertion of the Smith-Peterson nail in the femur includes the possibility of infection;[7] that infection in any major joint in the body is considered a major medical problem in orthopedic procedures; that the condition of avascular necrosis can be caused by a septic as well as an aseptic condition; that low-grade infection, as found in Mrs. Bryant, is not associated with all of the "Reader's Digest and Good Housekeeping" signs of infection (swelling, high temperature and general sickness); that low-grade infection is as significant as any of the more virulent forms of infection which might result from this type of surgery; that such a low-grade infection requires immediate treatment; and that severe pain as exhibited by Mrs. Bryant is generally associated with infection and not with an aseptic necrosis. In addition to the above evidence, the jury could consider that Dr. Schnell would have included evidence of infection as part of his differential diagnosis as early as October 26, 1965. Dr. Litton testified that his examination of the X-rays revealed the possibility of infection as early as the November 17 X-ray. Moreover, when Mrs. Bryant was transferred to the Columbia Medical Center the attending physicians' initial diagnosis included the possibility of infection.

The majority opinion reasons that even assuming evidence of negligence there was no expert opinion as to causation. This again totally and completely ignores the admonition and standard of the United States Supreme Court in the *Sentilles* case when dealing with a precise challenge to equivocal proof concerning medical causation.[8] The Supreme Court observed:

"The jury's power to draw the inference that the aggravation of peti-

---

ion,' from 'an ordinary case of negligence, where the jury is able to solve the question by applying thereto their own experiences' and '*the test is: How would a reasonably prudent man have acted under the circumstances?*'" (My emphasis.) Washington Hospital Center v. Butler, 127 U.S.App.D.C. 379, 384 F.2d 331, 336 (D.C.Cir.1967).

5. Turning to the record in the instant case, the following testimony from Drs. Harper and Rankin is noted:

(1) Dr. Harper admitted that one can have both aseptic and septic necrosis at the same time.

(2) Dr. Rankin testified that septic necrosis is not unknown to the field of orthopedic surgery and admitted that it can be dangerous once it occurs.

(3) According to Dr. Rankin, he knew that the low-grade infections do not produce the same demonstrable symptomatology (i. e., fever, etc.) as do the more fulminating type infections.

(4) Dr. Rankin admitted that *had he suspected hip infection, he would have attempted a needle aspiration of the hip joint.*

(5) Dr. Rankin testified that Mrs. Bryant received several white blood count tests since a high WBC would have indicated infection. However, the hospital records reveal only two such WBC tests were taken the entire six months Mrs. Bryant was under the care of the defendant-doctors. Dr. Rankin claims he is "at a loss to explain why they [more WBC tests] are not on these charts." Cf. Cooper v. United States, 313 F.Supp. 1207 (D.Neb.1970).

6. See Hill v. Gonzalez, 454 F.2d 1201 (8 Cir. 1972); Shepherd v. McGinnis, 257 Iowa 35, 131 N.W.2d 475 (1964); Sheffield v. Runner, 163 Cal.App.2d 48, 328 P.2d 828 (Cal.Dist.Ct.App.1958); Prosser, Law of Torts, § 32 at 167 (3d ed. 1964).

7. It was recognized at an early date that an open reduction is a dangerous surgical procedure because of the great possibility of infection. Cf. Maxwell v. Howell, 114 W.Va. 771, 174 S.E. 553 (1934); Sweet v. Douge, 145 Wash. 142, 259 P. 25 (1927).

8. The question of which law (federal or state) controls the sufficiency of evidence in a diversity case has never been determined by this court. We have always assumed that both the law of the state

tioner's tubercular condition, evident so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause. Neither can it be impaired by the lack of medical unanimity as to the respective likelihood of the potential causes of the aggravation, or by the fact that other potential causes of the aggravation existed and were not conclusively negated by the proofs. *The matter does not turn on the use of a particular form of words by the physicians in giving their testimony. The members of the jury, not the medical witnesses, were sworn to make a legal determination of the question of causation.* They were entitled to take all the circumstances, including the medical testimony, into consideration. See Sullivan v. Boston Elevated R. Co., 185 Mass. 602, 71 N. E. 90; Miami Coal Co. v. Luce, 76 Ind.App. 245, 131 N.E. 824. *Though this case involves a medical issue, it is no exception to the admonition* that, 'It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. . . . The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. . . . Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.' Tennant v. Peoria & Pekin Union R. Co., 321 U.S. 29, 35, [64 S.Ct. 409, 412, 88 L.Ed. 520]. The proofs here justified with reason the conclusion of the jury that the accident caused the petitioner's serious subsequent illness. See Rogers v. Missouri Pacific R. Co., 352 U.S. 500, [77 S.Ct. 443, 1 L.Ed.2d 493]." (My emphasis.) 361 U.S. at 109–110, 80 S.Ct. at 175.

The majority opinion reasons that both of Mrs. Bryant's experts testified that had the nail been removed and a spica cast applied in December 1965 or January 1966 rather than in March 1966, the results would probably have been no different. This analysis misses the critical issue. The issue is whether sufficient evidence was adduced upon which the jury could find a reasonable probability that the defendants' failure to properly diagnose and treat the infection proximately contributed to the radical treatment ultimately required and resulting in Mrs. Bryant's disabling condition.

Apropos here is comment (b) of the Restatement (Second) of Torts, § 433B (1965):

"b. The plaintiff is not, however, required to prove his case beyond a reasonable doubt. He is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. *It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not.* The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would

and the federal law require the same tests in weighing the sufficiency of the evidence. We have acknowledged this principle in evaluating diversity cases under Iowa law. Ford Motor Co. v. Mondragon, 271 F.2d 342 (8 Cir. 1959). If this be true then this court should adhere to the standards used by the Supreme Court of the United States in negligence cases. If, under the evidence presented here, we applied the tests set forth in Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959) and Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946), we would leave this jury verdict undisturbed.

have occurred if the defendant had acted otherwise. If, *as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists.* In drawing that conclusion, the triers of fact are permitted to draw upon *ordinary human experience* as to the probabilities of the case." (My emphasis.)

It is true that once again plaintiff's counsel failed to produce any expert testimony specifically stating that the defendants' action proximately contributed to the plaintiff's condition. However, Dr. Schnell did testify that infection is always a serious complication in orthopedic surgery and that infection should be detected as early as possible *in order to prevent destruction of the joint surfaces.* Similarly, Dr. Litton testified that the sooner you find an infection, the better the chance is of obtaining a good result; he further related that as of March 1966 the extent of the infection necessitated removing the nail and placing Mrs. Bryant in a spica cast since "in the face of the infection that we had discovered there, we felt any attempt to do anything else *would not be successful.* And we knew that if she would get a solid hip fusion, she would have a very serviceable and a painless hip" (my emphasis); Dr. Schnell indicated that *he would have performed other procedures when the infection was first noted with the expectation of better stabilizing the hip and reducing the amount of leg shortening;* Dr. Anderson [9] stated in his deposition that "[a] common *cause* in someone who you assume had an normal hip a short time previously for the cartilage to disappear is an *infection.*" (My emphasis.) The seriousness and destructive nature of infection is common knowledge to laymen. It should not require a doctor to establish that the presence of infection is not conducive to the body's healing mechanisms.

In light of the above, it is difficult to reason that there is not sufficient evidence on which a jury could find it reasonably probable that the failure to detect the infection contributed to Mrs. Bryant's disabled condition. The fact that there is some testimony that the end result would "probably" be the same or that it is only "possible" that the infection caused deterioration of the femur is not, *ipso facto,* conclusive evidence that the case should be taken from the jury. Cf. Dickinson v. Mailliard, 175 N.W.2d 588 (Iowa 1970).[10]

A jury is entitled to draw reasonable inferences from all of the evidence to determine whether there exists sufficient probability that late discovery of the infection contributed to plaintiff's disability. As the Iowa Supreme Court said in Daiker v. Martin, 250 Iowa 75, 91 N.W.2d 747, 752 (1958), " . . . the question of . . . [proximate cause] . . . was one of fact rather than medical theory or expert opinion and was for the jury to determine." See also, Wheatley v. Heideman, 251 Iowa 695, 102 N.W.2d 343 (1960); Stickle-

9. At the time of trial Dr. Anderson was a clinical instructor in orthopedic surgery at the University of Missouri's Columbia Medical Center.

10. In Lavender v. Kurn, 327 U.S. 645, 652–653, 66 S.Ct. 740, 743, 90 L.Ed. 916 (1946), wherein the Supreme Court was faced with reviewing a judgment n. o. v., the Court observed:
   "It is true that there is evidence tending to show that it was *physically and mathematically impossible* for the hook to strike Haney. And there are facts from which it might *reasonably be inferred* that Haney was murdered. But such evidence has become irrelevant upon appeal, there being a *reasonable basis* in the record for inferring that the hook struck Haney. The jury having made that inference, the respondents were not free to relitigate the factual dispute in a reviewing court. Under these circumstances it would be an undue invasion of the jury's historic function for an appellate court to weigh the conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury." (My emphasis.)

man v. Synhorst, 243 Iowa 872, 52 N.W. 2d 504 (1952); cf. Marshall v. Humble Oil & Refining Co., 459 F.2d 355 (8 Cir. 1972). In Fireman's Fund Insurance Co. v. Aalco Wrecking Co., 392 F.2d 179, (8 Cir. 1972), this court recently observed:

"There are many instances in tort litigation where precise causation becomes difficult to prove. There is no exact way to prove that the harm might have been avoided, because the harm did in fact take place. . . . A plaintiff does not have the negative burden to show that the harm could not have possibly occurred if the defendant had performed the duty breached. It would be absurd to say that a defendant could hide behind such absence of proof where his own conduct has created the fertile ground for harm and the harm did in fact occur. It has long been recognized that:

'[I]f the actor's negligence, either of act or omission, results in harm of the sort from which the duty was designed to protect the other, his negligence may be regarded as a substantial factor in bringing about the harm in spite of the fact that the same harm might possibly have been sustained had the actor not been negligent. Maryland v. Manor Real Estate & Trust Co., 176 F.2d 414, 418 (4 Cir. 1949).' "[11]

In Weintraub v. Rosen, 93 F.2d 544, 547–548 (7 Cir. 1937) (alleged malpractice in failure to discover and reduce a fracture of the femur), the court of appeals noted:

"That injury proximately resulted to appellant from appellees' negligence we think there can be no doubt under the evidence. What those injuries were we can not define with accuracy.

This is largely true in all such cases. *Even had there been no negligence there is no assurance that the patient's hip would have been in any better condition than it is now. These are matters which are not subject to exact proof, and yet they are matters for the jury's determination.*" (My emphasis.)

In Wilson v. Corbin, 241 Iowa 593, 41 N.W.2d 702, 708 (1950), the Iowa court observed:

"We have frequently held the issue of proximate cause is ordinarily for the jury where there is substantial evidence of a defendant's negligence. Lindquist v. Des Moines Union Ry. Co., 239 Iowa 356, 362, 371, 30 N.W.2d 120, 123, 127, and citations; Dunham v. Des Moines, Ry. Co., Iowa, [240 Iowa 421] 35 N.W.2d 578, 582."

Finally, the defendant-doctors argue that the lower court was correct in granting the judgment n.o.v. since the jury verdict necessarily involved speculation and conjecture as to the proximate cause issue. However, the forcefulness of any "speculation and conjecture" argument is effectively undercut by the Court in Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946), where Mr. Justice Murphy states:

"*It is no answer to say that the jury's verdict involved speculation and conjecture.* Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a *measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference.* Only when there is a complete absence of probative facts to support the conclusion reached does a reversi-

---

11. Compare Judge Sobeloff's observations in Hicks v. United States, 368 F.2d 626, 632 (4 Cir. 1966), where he wrote:
"Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to

pass. The law does not in the existing circumstances require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly. Harvey v. Silber, 300 Mich. 510, 2 N.W.2d 483 (1942)."

ble error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." (My emphasis.)

See also Jeanes v. Milner, 428 F.2d 598, 604–605 (8 Cir. 1970).

The record in the instant case reveals that the jury was properly charged as to proximate cause and admonished not to conjecture or speculate. The fact that the jury returned a verdict in favor of Mrs. Bryant indicates that they *rejected* the defendant-doctor's speculative causal possibilities and in weighing the evidence *found* reasonable proximate cause.[12] Cf. Marshall v. Humble Oil & Refining Co., supra.

I conclude under all of the evidence that the jury could find without opinion evidence[13] that the defendants were negligent in failing to consider the possibility of a low-grade infection in making their diagnosis and in failing to use tests known to them to determine wheth-

er infection existed as the cause of the plaintiff's rapidly developing necrosis. I likewise conclude that the jury could legitimately infer from all of the evidence that the delay in treating the infection causally contributed to plaintiff's long duration of pain[14] and to the radical procedure ultimately used which has crippled a young housewife and mother for life.

12. Jury Instruction No. 7a reads:
"If you believe from the evidence that the conditions and things of which plaintiff complains were caused or occasioned by or from any cause or causes over which the defendants had no control, or for which they are not responsible, your verdict must be in favor of the defendants. If you believe that it cannot be determined by a preponderance of the evidence whether the conditions of which the plaintiff complains were or were not caused by any act or failure to act on the part of the defendants, or by anything over which they had no control, your verdict must be in favor of the defendants. You are not allowed to conjecture or speculate as to the cause of the injuries, if any, in this case."

13. I emphasize that by lack of expert testimony I mean *direct* testimony that the defendants' negligent diagnosis and treatment contributed to the plaintiff's present

physical condition. As the record demonstrates, there was an abundance of expert medical testimony in this case but it was not utilized in the manner typical of most malpractice suits.

14. See Wilson v. Corbin, 241 Iowa 593, 41 N.W.2d at 708 where the Iowa court observed:
"Of course the original injury, even if promptly diagnosed and treated, would naturally cause much pain, loss of time, and perhaps some permanent stiffness. And it may be difficult to determine precisely how much of plaintiff's total damage is due to the injury and how much to defendant's negligence. Indeed pain is of course incapable of exact pecuniary compensation in any case. But we think the testimony affords a substantial basis for an intelligent award of damages."
Cf. Provancial v. United States, 463 F.2d 760 (8 Cir. 1972) ; Kosak v. Boyce, 185 Wis. 513, 201 N.W. 757 (1925).